

# SUPREME COURT OF MISSOURI
## en banc

G. STEVEN COX,             )
                               )
        Appellant,           )
                               )
v.                                 )         **No. SC94462**
                                )
KANSAS CITY CHIEFS        )
FOOTBALL CLUB, INC.,      )
                                )
        Respondent.        )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
**The Honorable James F. Kanatzar, Judge**

*Opinion issued September 22, 2015*

Steven Cox, a former Kansas City Chiefs employee, appeals a judgment for the Chiefs following a jury trial. He contends that certain trial court rulings excluding evidence from nonparty former employees and limiting discovery in his single-act age discrimination case were in error. The trial court ruled that the testimony of other former employees as to their ages and the circumstances under which their employment with the Chiefs ended was inadmissible on grounds that the employees were directly fired or forced out by different managers and worked in different departments, among other distinctions, and, therefore, were not "similarly situated" to Mr. Cox. The trial court, likewise, ruled that testimony as to a discriminatory statement allegedly made by a Chiefs executive who did not supervise Mr. Cox was inadmissible.

This Court determines that the trial court misapplied the legal standard for the admission of evidence by so-called "me too" witnesses by issuing a blanket ruling requiring the strict level of similarity that would support a disparate treatment claim when the standard for admitting such testimony as circumstantial evidence of the employer's discriminatory intent instead depends on many factors, including the plaintiff's circumstances and theory of the case. Here, the plaintiff alleges a company-wide policy of discrimination executed over a several months-long period both before and after his own termination. As such, the trial court abused its discretion in excluding "me too" evidence offered by several employees who, like Mr. Cox, were older than age 40, were terminated during the time period in question and replaced by younger workers, and many of whom were terminated directly or indirectly by the person who fired Mr. Cox. These commonalities make "me too" evidence relevant and admissible in this case even when the other former employees are not similarly situated in all respects.

For these reasons and for reasons discussed below, the trial court also erred in excluding the evidence concerning the discriminatory age-related statement and in quashing the deposition order issued to the Chiefs' chairman and chief executive officer. The judgment is vacated, and the case is remanded.

## I.    *FACTUAL AND PROCEDURAL BACKGROUND*

The Chiefs hired Mr. Cox as a maintenance manager in 1998. At that time, Carl Peterson served as the Chiefs' president and general manager, supervising both the business side and the football-operations side of the organization. Mr. Cox presented evidence to the jury that, in 2008, Mr. Peterson told longtime employee Ann Roach that

there would be changes to the Chiefs front office staff under the leadership of the new chairman and chief executive officer, Clark Hunt, because Mr. Hunt "wanted to go in a more youthful direction."

When Mr. Peterson resigned in 2008, Mr. Hunt did commence an organizational restructuring. To that end, he hired Scott Pioli in January 2009 to run football operations as general manager and Mark Donovan in May 2009 to serve as chief operating officer who, along with interim president Denny Thum, oversaw all business operations including stadium operations. After Mr. Thum (then age 59) was fired in September 2010, Mr. Donovan (age 43 or 44) was named president in 2011.

After Director of Stadium Operations Steve Schneider (age 51) was fired in January 2010, Mr. Cox took on additional responsibilities and reported directly to Mr. Donovan for several months until, in April 2010, David Young (age 34) and Brandon Hamilton (age 39) were hired to fill the newly created positions of vice president of stadium operations and director of facilities, respectively. Mr. Cox was not invited to interview for these new positions.

On October 14, 2010, Mr. Cox's employment with the Chiefs was terminated in a meeting attended by Mr. Young, Mr. Hamilton, and the new director of human resources, Kirsten Krug (age 42). Although Mr. Donovan did not attend the meeting and was no longer Mr. Cox's direct supervisor, he later testified at trial that he himself made the decision to fire Mr. Cox for reasons of poor performance and insubordination. At the time of his termination, Mr. Cox was 61 years old. His position was filled shortly

3

thereafter by a 37-year-old. [1]

Mr. Cox filed a charge of discrimination with the Missouri Commission on Human Rights and was issued a right to sue letter. He then filed his petition in the Jackson County circuit court alleging a single act of age discrimination on the day of his termination. His theory of the case was that the Chiefs, starting with Mr. Hunt and his desire to "go in a more youthful direction," had instituted a company-wide policy of terminating or forcing out older employees to make way for younger replacements. Mr. Cox sought to depose Mr. Hunt and certain other Chiefs officials and later to subpoena Mr. Hunt for trial. The Chiefs opposed the depositions on the basis that Mr. Cox had only pleaded an individual discrimination claim, not a pattern-or-practice claim of discrimination in the workplace. Mr. Cox argued that the sought-after discovery would be relevant to his individual claim as well as to any claim of pattern-or-practice discrimination. The trial court allowed other depositions but quashed the deposition notice of Mr. Hunt; later, the trial court also quashed a subpoena issued to Mr. Hunt to testify at trial.

As evidence of the company policy in action, however, Mr. Cox also presented testimony that another employee, then age 60, was told by the Chiefs' president that he would have been considered for the position of chief financial officer "if [he] weren't so old." Further testimony was presented to the jury that, at a directors meeting in January 2011 that Mr. Donovan attended, another high-level manager stated that "[t]hese old

---

[1] The Chiefs claim that Mr. Cox was fired because he gave another person a raise that Mr. Cox claimed was required by a collective bargaining agreement. It is for the jury to determine which version of facts it believes.

4

people [employees] around here think they're entitled to everything."

In pretrial proceedings, the Chiefs filed a number of motions in limine seeking the exclusion of additional evidence. As is relevant to this appeal, the Chiefs filed a motion to exclude evidence of 17 "non-similarly situated former employees" whom the Chiefs anticipated Mr. Cox would call to testify as to the circumstances surrounding their separations from the Chiefs organization.[2] The Chiefs again raised the "pattern-or-practice" argument, asserting that because Mr. Cox alleged only a single act of discrimination, and not a pattern or practice of discrimination, he could not offer the testimony of other former employees to show such a pattern or practice. The Chiefs also argued that these employees were not similarly situated to Mr. Cox, rendering their testimony irrelevant and prejudicial. The trial court granted the Chiefs' motion without explanation. On the first day of trial, the court clarified its ruling:

> My order granting that motion in limine pertains to you calling those 17 witnesses to testify that they were terminated, they have a case of discrimination pending against the Chiefs, and I suppose they're over forty. If you want to call these witnesses for some other purpose, that is outside my ruling on this motion in limine.
> ….
> But I hope I made myself clear as it pertains to my ruling on the Defendant's Motion *in Limine* as to those 17 witnesses: nothing about the fact that they've been terminated, they have a lawsuit, or that they're over forty.

In other words, Mr. Cox was permitted to call these witnesses to present other evidence, but they could not testify as to whether they too had filed age discrimination

---

[2] The 17 former employees named in the motion are: Anita Bailey, Gene Barr, Ken Blume, Evelyn Bray, Larry Clemmons, Doug Hopkins, Pam Johnson, Carol Modean, Bill Newman, Pete Penland, Carl Peterson, Ann Roach, Lisa Siebern, Brenda Sniezek, Nadine Steffan, Tom Stephens, and Lamonte Winston.

suits against the Chiefs,[3] or to any of the circumstances surrounding their terminations from employment with the Chiefs, or even how old they were. The latter prohibitions also precluded plaintiff from offering any testimony as to the ages of employees hired to replace these former employees. Over the course of the trial, the court expanded its exclusionary ruling to at least three additional witnesses not named in the Chiefs' motion in limine. Those witnesses, likewise, were not permitted to testify before the jury as to their ages or as to the fact of and the circumstances surrounding their terminations or resignations from employment with the Chiefs, nor could they discuss the ages of the employees who replaced them.

Despite the trial court's declaration that "I don't think it's necessary that you make an offer of proof for each and every one of these 17 witnesses," Mr. Cox did make an offer of proof for at least 11 witnesses—eight of the 17 named in the motion in limine and the three additional witnesses to whom the court extended its ruling. Additionally, Scott Pioli testified during an offer of proof as to two more of the 17 named witnesses. Most of these offers of proof took the form of direct questioning and, in some cases, cross-examination outside the presence of the jury. They generally established the employees' ages, job titles, the circumstances of their departures from the Chiefs organization, and the approximate ages of their replacements. Together, the offers of proof presented evidence that, over approximately 12 months, a large number of employees over age 40 were either fired or pressured to resign and their job duties were

---

[3] At the time of trial, Larry Clemmons and Brenda Sniezek also had lawsuits pending against the Chiefs.

assumed by younger replacements, most of them under 40. The trial court denied Mr. Cox's requests to have this testimony presented to the jury.

The Chiefs also filed a motion in limine, which the court granted, excluding testimony by former Field Security Supervisor Herman Suhr as to certain alleged statements made by Mr. Pioli. In a videotaped deposition, Mr. Suhr testified that, in August or September 2009, he overheard Mr. Pioli say to an unknown person in a stadium hallway: "I need to make major changes in this organization as so many employees of CP [Carl Peterson] are over 40 years old." At trial, Mr. Cox submitted offers of proof both from Mr. Suhr, in the form of his deposition testimony, and from Mr. Pioli who testified outside the presence of the jury that he made no such statement. The trial court overruled Mr. Cox's motion to set aside its exclusionary order and further refused to admit the statement as impeachment evidence against Mr. Pioli.

The jury ultimately returned a verdict in favor of the Chiefs. Following an opinion by the court of appeals, Mr. Cox sought and was granted transfer to this Court pursuant to article V, section 10 of the Missouri Constitution.

## II. STANDARD OF REVIEW

A trial court "enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *Moore v. Ford Motor Co., 332 S.W.3d 749, 756 (Mo. banc 2011)* (internal citation and quotation marks omitted). A ruling constitutes an abuse of discretion when it is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of

7

careful, deliberate consideration." *Lozano v. BNSF Ry. Co., 421 S.W.3d 448, 451 (Mo. banc 2014).* "By both statute and rule, an appellate court is not to reverse a judgment unless it believes the error committed by the trial court against the appellant materially affected the merits of the action." *Id.* A trial court's discovery rulings are also reviewed for abuse of discretion. *State ex rel. BNSF Ry. Co. v. Neill, 356 S.W.3d 169, 172 (Mo. banc 2011).* "[A] trial court has no discretion to deny discovery of matters [that] are relevant to [a] lawsuit and are reasonably calculated to lead to the discovery of admissible evidence when the matters are neither work product nor privileged." *Id.* (internal citation omitted). [4]

---

[4] Rule 83.08(b) states, in part: "The substitute brief…shall not alter the basis of any claim that was raised in the court of appeals brief …." This Court rejects the Chiefs' argument that Mr. Cox violated this rule by raising new arguments not raised in his court of appeals brief. To the contrary, Mr. Cox's point relied on in his court of appeals brief clearly states that the trial court erred in excluding the evidence in question "because such evidence was *highly relevant* to appellant's claims of age discrimination in that it would have demonstrated Respondent's discrimination against other front office employees on the basis of their age, and would have demonstrated respondent's discriminatory motives and/or intent." (Emphasis added). This is substantially the same basis for his claim before this Court and, to the extent that his brief below does not specifically apply the legal relevance standard to the excluded evidence, Rule 83.08(b) does not prohibit a party filing a substitute brief with this Court from improving the brief with more detailed legal analysis than that articulated below. Were that the meaning of Rule 83.08(b), there would be no point in encouraging or allowing substitute briefs at all.

The Chiefs also argue that Mr. Cox did not adequately explain in his court of appeals brief the logical relevance of each witness's testimony that he argues should have been admitted, and should not be held to have preserved that issue in this court. The Chiefs further argue that Mr. Cox's substitute brief also fails to adequately argue logical relevance. Mr. Cox's discussion in Point I of his court of appeals brief sets out the commonalities between himself and the "me too" witnesses (including age over 40, replacement by younger employees, and termination by Mr. Donovan) that show the logical relevance of that evidence, and the details concerning each witness appear in the statement of facts. In Point I of his substitute brief, Mr. Cox provides the names, ages, and common decisionmakers presented in the offers of proof made at trial. He further

8

### III. THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING CIRCUMSTANTIAL EVIDENCE OF OTHER EMPLOYEES ALLEGEDLY FIRED BASED ON AGE

Section 213.055.1[5] of the Missouri Human Rights Acts (MHRA) states:

It shall be an unlawful employment practice:
(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:
(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability; ….

The statute defines "age" as "forty or more years but less than seventy years." *§ 213.010(1).* In reviewing a case brought under the MHRA, appellate courts look to Missouri law but also are guided by federal employment discrimination cases to the extent they are consistent with Missouri law. *Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. banc 2007).* This Court has noted that the MHRA is "not identical to the federal standards and could offer greater protection" against discrimination than that offered under Title VII. *Templemire v. W & M Welding, Inc.,*

---

argues in his substitute brief that such evidence is logically relevant because it "tends to prove" Mr. Cox's theory of a company-wide policy of replacing older workers with younger ones. As this Court previously has observed, "logical relevance has a very low threshold." *State v. Anderson, 76 S.W.3d 275, 277 (Mo. banc 2002).* Moreover, it is this "Court's policy to decide a case on its merits whenever possible." *Williams v. Hubbard, 455 S.W.3d 426, 432 (Mo. banc 2015).* Mr. Cox's briefing presents no bar to review on the merits here.

Finally, the Court notes that the Chiefs failed to include any argument in their brief that matched their suggestion at oral argument that Mr. Cox's offers of proof made at trial were inadequate and did not preserve any of the excluded evidence for appeal. While not suggesting that there was any inadequacy in the offers made, this Court declines to consider this argument further as it was not briefed and any deficiency is not clearly apparent in the record.

[5] Statutory references are to RSMo 2000.

*433 S.W.3d 371, 383 (Mo. banc 2014)*; *Daugherty, 231 S.W.3d at 818-19.* In particular, under the MHRA a plaintiff must show that his age was a "contributing factor" in the discriminatory act, while the federal cases apply the more stringent "motivating factor" standard. *See Templemire, 433 S.W.3d at 383.*

Employment discrimination cases, as this Court has noted, "often depend on inferences rather than on direct evidence … because employers are shrewd enough not to leave a trail of direct evidence." *Daugherty, 231 S.W.3d at 818, 818 n.4.* Therefore, individual plaintiffs claiming discriminatory employment action on the basis of age, or any other protected classification, generally must rely on circumstantial evidence. *Id.*; *U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)* ("There will seldom be 'eyewitness' testimony as to the employer's mental processes").

As with other forms of evidence, circumstantial evidence of employment discrimination must be both logically and legally relevant to be admissible. *See State v. Tisius, 92 S.W.3d 751, 760 (Mo. banc 2002).* "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Id.* The legal relevance analysis requires the trial court to balance "the probative value of the proffered evidence against its prejudicial effect on the jury." *Id.*

### A. *Exclusion of Evidence of Age Discrimination Against Other Employees*

Mr. Cox sought to introduce evidence of the firings of other older employees, often with younger people replacing them, as circumstantial evidence of the Chiefs'

discriminatory intent in terminating his own employment. In explaining its ruling excluding such evidence, the trial court said:

> And just to reiterate so the record is clear, that ruling is based upon the fact that these peoples' terminations, *the people who terminated them were not decisionmakers in the termination of the plaintiff in this case* and also because *the plaintiff did not plead a pattern and practice, did not plead pattern and practice, did not plead a hostile work environment*, and for these reasons and other reasons that I'm not going to go into that were cited and argued by defense counsel in their motions and in their oral arguments, these witnesses are going to be excluded from those three areas of any kind of testimony that would touch upon those three areas [age, termination by the Chiefs, and pending lawsuits against the Chiefs].

(Emphasis added). The court then reiterated to Mr. Cox's counsel: "[T]he primary thing was that you didn't plead pattern and practice and that these employees were not similarly situated to Mr. Cox." The trial court applied this ruling so strictly that when questioning most witnesses, counsel were not even permitted to ask them how old they were.

Taking each of these primary grounds in turn, the trial court's ruling appears to rest first on its belief that because Mr. Cox did not "plead pattern and practice" discrimination, evidence that the Chiefs fired other older employees was not relevant to his claim. "Pattern or practice" is a legal term of art in the federal employment discrimination context and refers to Title VII's authorization of lawsuits when a company repeatedly and regularly engages in discriminatory conduct prohibited by the federal statute.[6] *Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)* (stating that

---

[6] Pattern-or-practice suits were initially authorized by the following language in section 707(a) of the Civil Rights Act of 1964:

such claims require a showing that "discrimination was the company's standard operating procedure"). Proof of a company's pattern or practice of discrimination "creates a rebuttable presumption in favor of individual relief." *Id. at 359 n.45.* The party bringing a pattern-or-practice suit may present statistical evidence of discriminatory employment practices as well as the testimony of individual employees concerning specific instances of discrimination experienced by them during their employment with the company in question. *Id. at 338.*

That Mr. Cox did not plead a company-wide pattern-or-practice claim under Title VII does not affect his right to bring other discrimination claims; indeed, this Court has not even addressed whether Missouri law permits pattern-or-practice claims. The dissent suggests that while Missouri has never ruled whether the MHRA permits a pattern-or-practice claim to be brought (its language is different from that of the relevant federal statutes), that does not mean that the trial court erred in considering Mr. Cox's failure to bring such a claim. The Chiefs say that Missouri's hostile work environment and continuing violation theories are comparable to the federal "pattern-or-practice" claim. The dissent suggests that while instances of "me too" discrimination against other employees would have been clearly relevant to such a claim, the trial court's refusal of

---

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a *pattern or practice* of resistance to the full enjoyment of any of the rights secured by this sub-chapter, and that the *pattern or practice* is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate District Court of the United States by filing with it a Complaint ....

(Emphasis added).

permission to Mr. Cox to amend to assert a pattern-or-practice claim (due to his failure to assert that claim at the administrative level, a ruling not before the Court on appeal)[7] somehow gave the trial court discretion beyond that it otherwise would have to exclude evidence of the "me too" firing of other employees.

Respectfully, nothing supports this suggestion.  In effect, the dissent is suggesting that if Mr. Cox's allegations are true, the Chiefs may *also* have created a hostile work environment, and that because the evidence of discrimination against other employees would have been admissible as direct evidence under that theory (although there is no suggestion that Mr. Cox would thereby get the benefit of a rebuttable presumption as in federal court so it is not clear why a plaintiff would want to take on this heavier burden), it was not an abuse of discretion to exclude this evidence as circumstantial evidence supporting Mr. Cox's traditional discrimination claim.

This just is incorrect in the same way it is incorrect to say a plaintiff who brings a negligence action is barred from introducing evidence of the fact that the defendant had warranted a product to be free from defects because the plaintiff *could have* brought a breach of warranty claim but failed to do so.  Although this type of evidence may be essential to a breach of warranty claim, that fact is irrelevant to whether it is admissible in a negligence action.  The trial court should undertake the same analysis as to whether the

---

[7]    *See Wallingsford v. City of Maplewood, 287 S.W.3d 682, 685 (Mo. banc 2009)*; *Plengemeier v. Thermadyne Industries, Inc., 409 S.W.3d 395, 402 (Mo. App. 2013)* ("Under the continuing violation theory, a victim of discrimination may pursue a claim for an act occurring prior to the statutory period, if she can demonstrate the act is part of an ongoing *practice or pattern* of discrimination by her employer.").

13

evidence is material and probative in the negligence action irrespective of whether the plaintiff also did or did not bring a breach of warranty claim.

Similarly here, whether Mr. Cox pleaded a hostile work environment claim should not affect the trial court's analysis as to whether evidence of "me too" firings of other persons over the age of 40 by the Chiefs is relevant as circumstantial evidence supporting Mr. Cox's individual discrimination claim. A plaintiff is the master of his or her lawsuit and can choose which causes of action to plead. If evidence is not relevant to the claims pleaded, then it should be excluded. But, if it is relevant, then it should be admitted, subject to an individualized balancing of probativeness with prejudice as to each such example of circumstantial evidence of discrimination, regardless of whether any particular piece of evidence would have been admissible on another unpleaded cause of action as well.[8]

Indeed, this is explicitly the case in federal court. In *Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 380-81, 387 (2008)*, the United States Supreme Court held that testimony by nonparty employees about discrimination can be relevant in a single-act discrimination case and that any *per se* exclusion of such evidence would constitute an abuse of discretion. The admissibility of such evidence instead must be determined on a case-by-case basis. *Id.* This analysis, *Sprint* directs, is "fact based and depends on many factors, including how closely related the evidence is to the plaintiff's

---

[8] It was only after the Chiefs argued in opposition to certain depositions that evidence about the firing of others was not relevant to Mr. Cox's individual discrimination claim and would be relevant only to a pattern-or-practice claim that Mr. Cox sought but was denied leave to amend to also assert a pattern-or-practice discrimination claim, as he believed the evidence would be relevant to both types of claims.

circumstances and theory of the case." *Id. at 388.*

The federal lower courts repeatedly also have recognized that so-called "me too" or "other acts" evidence of "behavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination" in the context of single-act employment discrimination claims such as that of Mr. Cox. *Hasan v. Foley & Lardner LLP, 552 F.3d 520, 529 (7th Cir. 2008)* (internal citation and quotation marks omitted); *see also Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1287 (11th Cir. 2008)* ("[T]he 'me too' evidence was admissible both because it was probative of the intent of the supervisors of Bagby Elevator to retaliate and discriminate against Goldsmith and was relevant to Goldsmith's hostile work environment claim").

This is the law in Missouri too. The trial court is not entitled to second-guess the plaintiff's pleading decisions and penalize the plaintiff on a pleaded cause of action because the trial court believes offered evidence would have been even more relevant to an unpleaded cause of action. The fact that the testimony of other older employees would be relevant to a federal pattern-or-practice claim or a hostile work environment claim had it been brought does not make such testimony less probative or more prejudicial for other purposes.

Here, the trial court issued a blanket ruling prior to trial excluding the "me too" testimony of 17 potential witnesses as to age, termination or other separation from employment by the Chiefs and, by extension, the age of the replacement employees. That exclusionary order was extended to at least three additional witnesses during trial.

15

The Chiefs argue on appeal that there was no blanket ruling because several of these witnesses did testify, but the trial court specifically prohibited them from even saying how old they were, much less testifying about their firings or resignations or any relevance of their ages to those events. And, despite the Chiefs' claim that the trial court "painstakingly revisited its *in limine* ruling with respect to [each] individual witness," the record reflects otherwise.

There was much discussion of the exclusion order over the course of the trial, but at no time did the court consider revising its ruling based on any individual witness's testimony or offer of proof. Instead, the trial court repeatedly admonished plaintiff's counsel to stay well away from the excluded topics during questioning ("Don't ask questions that are outside of my—that elicit responses that are outside of my order") and, when reminded that his order was interlocutory, reaffirmed the exclusion of such testimony ("We've talked about this already. … It's not coming in"). The trial court did at one point recognize the inherently interlocutory nature of its order: "That ruling is going to stand unless I'm convinced to change my mind. … I've heard a great deal of your testimony in this case and I don't anticipate changing my mind, but the only thing you all need to worry about is unless I tell you I'm changing my order, the order stands."

But the record does not reflect that the trial court engaged in a witness-by-witness reexamination of its order when presented with the new facts in each offer of proof. [9] Rather, it issued a single ruling that it would not admit the testimony of multiple

_____

[9] The court did issue individual rulings on two offers of proof, denying in each instance Mr. Cox's request that the offered testimony be presented to the jury and explaining only that the denial was "[b]ased on [its] previous rulings."

witnesses for whom the plaintiff made offers of proof, and did so without reference to the specific facts elicited in each or any offer. For the reasons noted, this blanket exclusion was error.

The Chiefs argue that even had the trial court erred in making an erroneous blanket ruling, the second primary ground for exclusion still applies; the nonparty employees' testimony was properly excluded because none were "similarly situated" or "sufficiently similar"[10] to Mr. Cox such that their testimony would be relevant to his claim. In support, the Chiefs cite federal cases in which plaintiffs allege that they were treated differently from other employees who were "similarly situated" but were of a different age, sex, or race. In such "disparate treatment" claims, the relevance of evidence as to the treatment of coworkers depends on whether those coworkers were otherwise similarly situated to the plaintiff. In determining whether coworkers were "similarly situated," courts analyze factors including whether the same supervisor imposed the discipline, whether the coworkers were subject to the same standards, whether they engaged in conduct of similar seriousness, and similar factors. *See, e.g., Coleman v. Donahoe, 667 F.3d 835, 850 (7th Cir. 2012)*; *Alexander v. Local 496, Laborers' Int'l Union of N. Am., 177 F.3d 394, 402-03 (6th Cir. 1999)* (a disparate treatment plaintiff must show "that he or she was treated differently from similarly situated members of the unprotected class"); *Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).* This analysis is appropriate in the disparate treatment context because,

---

[10] The trial court used these terms interchangeably.

17

there, the plaintiff must prove that the motivating distinguishing factor leading to the more severe discipline was his or her membership in the protected group.

In the context of "me too" evidence such as that excluded here, the plaintiff's claim of relevance is just the opposite—that he and others were treated similarly by being disciplined or fired and that the dominant common factor between himself and the others who were disciplined or fired is their membership in the protected group. *Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 873 (Mo. App. 2009)*, the case primarily relied on by the trial court below, recognized this distinction between the relevance of evidence concerning other employees' discipline to a disparate treatment claim versus the relevance of "me too" evidence in a case alleging a single act of discrimination. In *Williams*, the plaintiff, a female probationary flight attendant who was fired by an airline after complaining of sexual harassment, sought to introduce evidence that another female flight attendant previously also had been fired after raising a sexual harassment claim. The airline objected to the admission of this evidence, arguing that the two women were not similarly situated because they had different statuses within the company and were accused of different misconduct at the time of firing. *Id. at 864.*

*Williams* rejected the airline's objection. In so doing, *Williams* first explained the basis on which evidence of similarly situated employees is introduced in a disparate treatment case and noted that the other flight attendant's firing would not be sufficiently relevant if the *Williams* plaintiff were bringing a disparate treatment claim:

> In analyzing discrimination claims, federal courts "generally recognize that instances of disparate treatment can support a claim of pretext, but the plaintiff bears the burden of establishing that the employees are similarly

18

situated in all relevant respects." *Young v. Am. Airlines, Inc.,* 182 S.W.3d 647, 654 (Mo. App. E.D. 2005) (internal quotations and emphasis omitted). Employees are deemed "similarly situated" when they are "involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.*; *see Wheeler v. Aventis Pharm.,* 360 F.3d 853, 857 (8th Cir. 2004). Under this federal analysis, Ray and Williams are not "similarly situated" because they were not involved in the same conduct yet disciplined in different ways.

*Id. at 873.*

But, *Williams* continued, the evidence of the other flight attendant's firing was relevant in the case before it because the plaintiff was offering it as circumstantial "me too" evidence of the discriminatory reason for her own firing:

In fact, Williams premises the introduction of the evidence relating to Ray's termination on the assertion that Ray and Williams were involved in the same conduct and disciplined in the exact same way. As such, we do not see the relevance of [the airline]'s argument that Ray and Williams were not "similarly situated" as it relates to the admission of evidence regarding Ray's termination.

*Id.*

In other words, *Williams* noted that both employees were disciplined the same way because both engaged in the same conduct—reporting sexual harassment by pilots—even though otherwise they did not hold the same position. *Williams* did not hold this to mean that evidence as to any person who was fired after reporting sexual harassment would be admissible, but rather said admissibility would be determined on a case-by-case basis. In *Williams*, both fired employees were female flight attendants and both were terminated by the same manager within 60 days of making their complaints. *Id. at 873-74.* This was sufficient even though different reasons for their firings were given and they held different positions within the company.

19

While the trial court cited to *Williams* in support of its ruling and even recognized that *Williams* draws a distinction between "similarly situated" employees in a disparate treatment case and "me too" evidence, it both misapplied *Williams*' teachings and misstated the facts of the case before it. A key basis for the trial court's exclusion of Mr. Cox's "me too" evidence, it said, was the lack of a common decisionmaker.[11] Even were a common decisionmaker required, Mr. Cox presented evidence that at least seven employees for whom offers of proof were made were fired or forced out by or at the behest of the same decisionmaker who ordered his own firing. Those employees are: Anita Bailey (then age 58), Evelyn Bray (age 55), Heather Coleman (about age 45), Carol Modean (age 48), Steve Schneider (over age 50), Brenda Sniezek (age 42 or 43), and Tom Stephens (age 52). All were fired by Mr. Donovan—who admitted he ordered Mr. Cox's direct supervisors to fire him—or by other persons who, like Mr. Cox's supervisor, directly reported to Mr. Donovan. The trial court's failure to account for the common decisionmaker in excluding these offers of proof itself requires reversal.

But, equally importantly, the trial court erred in its belief that evidence of the firing of other employees is not admissible if not directed by the same decisionmaker. It

---

[11] The trial court stated on several occasions:

> And just to reiterate so the record is clear, that ruling is based upon the fact that these peoples' terminations, the people who terminated them were not decisionmakers in the termination of the plaintiff in this case …
>
> ….
>
> I think that some of them may have been terminated by people that weren't decisionmakers and that also came into my consideration …
>
> ….
>
> But some of them, I think, were not decisionmakers, were not fired by decisionmakers of Mr. Cox's.

20

also erred in applying *Williams* in a manner that required employees to have at least as many similar characteristics as did the employees in *Williams* for their firings to be sufficiently similar to be admissible.[12]  This was not a careful balancing of probative value versus prejudicial impact, as the dissent would suggest; it was an abuse of discretion in issuing a blanket rejection of other instances of employees being fired based on their age, even where they were fired by the same supervisor or by one reporting to the same supervisor.

The dissent also implies that the trial court's finding that Cox was not similarly situated and its finding that the probative value of all of the testimony of all of these witnesses was outweighed by its prejudicial effect, are independent bases for excluding the testimony.  But, as this Court noted in *State v. Bernard, 849 S.W.2d 10, 22 (Mo. banc 1993)*, while the trial court must consider both probative value and prejudice, the concepts and their application are interrelated:  "Evidence acquires *legal relevance …* only when the provative value of its *logical relevance* outweighs the danger of unfair prejudice …"  (emphasis added).  Therefore, when determining the legal relevance of evidence a court must do so in light of the logical relevance, or probativeness, of the evidence.

---

[12] The trial court stated:
> The court in *Williams* identified five separate examples of similarity between the plaintiff and the other terminated employee.  In examining the record in the offers of proof, it was clear to me that such similarity didn't exist between the proffered witnesses and Mr. Cox's termination.  In my determination, any probative value of the testimony proposed by the plaintiff from these witnesses would be outweighed by the prejudicial effect it would have on the jury.  In addition, I believe the testimony of these other past employees would only serve to confuse and distract the jury.

21

In its logical relevancy analysis, the trial court erroneously interpreted and applied *Williams,* incorrectly believing that the same decisionmaker was not involved in the other firings, and that each piece of evidence must be similar in at least five ways because that happened to be the case in *Williams*. As a result, it incorrectly concluded that none of these witnesses were similarly situated.

These mistakes are what led the court to make a blanket, and erroneous, determination that the prejudice of introducing this evidence outweighed its probative value in all instances. In other words, the trial court's analysis of the legal relevance of the excluded evidence requires the court to weigh its logical, probative value against its prejudicial effect. The trial court's erroneous belief that the evidence had little or no logical relevance to Mr. Cox's individual discrimination claim led it to abuse its discretion in balancing this probativeness against any prejudicial effect of permitting the evidence to be introduced.

Finally, the United States Supreme Court in *Sprint* and most subsequent federal cases hold that it is error to reject "me too" evidence based solely on the fact that the other employees had a different supervisor or were fired by a different person. *See, e.g., Sprint, 552 U.S. at 382* (noting that none of the "me too" witnesses in that case worked in the same unit as plaintiff, "nor had any of them worked under the supervisors in her chain of command").[13] Rather, as *Sprint* cautions, the inquiry is "fact based and depends on

---

[13] Some federal district court cases recently have held that "me too" evidence is relevant and admissible only when there is a common decisionmaker. *See, e.g., Hamilton v. Coffee Health Grp., 949 F. Supp. 2d 1119, 1158 (N.D. Ala. 2013)*; *Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012)*. These cases cite *Goldsmith v. Bagby*

many factors." *552 U.S. at 388.* There is no one set of agreed-upon factors, and no one factor is dispositive.

*Griffin v. Finkbeiner*, 689 F.3d 584, 598-99 (6th Cir. 2012), provides an example. The Sixth Circuit reversed the district court's decision to exclude "me too" evidence solely on the basis that there had been no common decisionmaker, stating:

> Whether the same actors are involved in each decision is a factor, but *Sprint* makes clear that it cannot be the only factor in the decision whether to admit "other acts" evidence. Notably, the testimony in *Sprint* involved supervisors "who played no role in the adverse employment decision challenged by the plaintiff." 552 U.S. at 380, 128 S. Ct. 1140. Here, the district court did not consider other ways in which the excluded evidence could be "related ... to the plaintiff's circumstances and theory of the case," *id.* at 388, 128 S. Ct. 1140, such as *temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of retaliation.*

*Id.* (emphasis added).

In other words, evidence of other firings or forced resignations at the hands of other decisionmakers may be admissible if this evidence would be relevant to the plaintiff's "circumstances and theory of the case" as determined through an individualized fact-based analysis applying factors of the kind listed. *Sprint, 552 U.S. at*

---

*Elevator Co., Inc., 513 F.3d 1261 (11th Cir. 2008)*, for this proposition but, in doing so, they misrepresent the holding in *Bagby*. There was a common decisionmaker in *Bagby*, but the court there noted that he was only one of at least five different supervisors involved in the terminations of the "me too" witnesses. *Id. at 1286*. *Bagby* does not say that a common decisionmaker is required for "me too" evidence to be admissible, and for the other cases to say so runs counter to *Sprint*, which clearly holds that discrimination by other supervisors can be relevant: "The question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *552 U.S. at 388*.

*388*. This was another reason for the trial court's improper blanket determination that the prejudicial effect of the evidence of other firings outweighed its probative value; it failed to make individualized determinations and applied the wrong "similarly situated" factors.

In addition to the factors set out in *Griffin*, courts have considered "whether it's the same place, the same time, the same decision makers, or whether it's such that the people who are making the decisions reasonably should have known about the hostile environment," *Bennett v. Nucor Corp., 656 F.3d 802, 810 (8th Cir. 2011)*, or "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated," *Elion v. Jackson, 544 F. Supp. 2d 1, 8 (D.C. Cir. 2008)*.

As the framing of these factors demonstrates, the admissibility of "me too" evidence does not require that the nonparty employees be "similarly situated" under the more stringent disparate treatment standard; rather, courts look to and weigh *aspects* of similarity as appropriate given the facts, context, and theory of the specific case at issue.[14] This was the approach taken in *Williams* also. *Williams* does not impose a test involving specific factors of similarity in order for "me too" evidence to be admissible

---

[14] Even in the disparate treatment context, similarly situated employees "need not be identical in every conceivable way. … So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied." *Coleman, 667 F.3d at 846* (internal citations omitted); *see also Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010)* ("[T]he similarly situated co-worker inquiry [in a disparate treatment case] is a search for a substantially similar employee, not for a clone").

and, in fact, cautions against misapplying the disparate treatment "similarly situated" standard in the context of evaluating the admissibility of "me too" evidence.

Mr. Cox's theory of the case was that all of the persons he identified were fired or forced out because they were older than 40 and most were replaced by persons younger than 40 pursuant to a plan developed at the highest level by Mr. Hunt and executed by Mr. Donovan and Mr. Pioli to bring in new, younger people to "become more efficient." Therefore, the key relevant factors would be whether Mr. Hunt, Mr. Donovan, or Mr. Pioli fired these other employees or whether they were fired by persons who reported to them, whether they were fired in temporal proximity to when Mr. Cox was fired, and whether other factors indicated that age may have played a role in their firings. Whether evidence about some of these individuals might be sufficiently similar for evidence of their firings to be admissible under a disparate impact or pattern-or-practice theory would not be dispositive of this determination, as those are not the claims Mr. Cox is pursuing.

The trial court erred in rejecting Mr. Cox's offers of proof as to many of the excluded witnesses because their testimony constituted circumstantial "me too" evidence in Mr. Cox's single-act employment discrimination case. As discussed, at least seven employees did share Mr. Donovan as a common decisionmaker. Additionally, Mr. Cox made offers of proof showing that several additional employees – including Gene Barr (age 58), Larry Clemmons (age 60), Ann Roach (over age 60), and Denny Thum (age 59) - were pressured to resign or were fired either directly or at the direction of Mr. Hunt after, according to other admitted testimony, Mr. Hunt indicated that the organization

would be going in a "more youthful direction."  Lamonte Winston[15] and Lisa Siebern similarly were terminated by Mr. Pioli, who also reported to Mr. Hunt and who, as discussed further below, was overheard stating that he had to make major changes because the former general manager had too many older employees.  All were fired or resigned within months of Mr. Cox's own firing, between January 2010 and January 2011.  All were over 40 at the time of their separation from the Chiefs, and Mr. Cox made offers of proof showing that at least nine – Ms. Bailey, Mr. Barr, Ms. Bray, Mr. Clemmons, Ms. Modean, Mr. Schneider, Ms. Sniezek, Mr. Stephens, and Mr. Thum – were either directly or effectively replaced with younger workers.  At least three also testified that they, like Mr. Cox, never received a negative performance review before they were fired or forced out, and most believed that the reasons given for their terminations were pretextual.

The Chiefs argue that there were distinguishing factors as to each of these employees that the trial court could have relied on to conclude that their testimony was not admissible as "me too" evidence.  These include, as discussed, having a different direct supervisor, working in a different department, or being fired before or after Mr. Cox's termination.  But when the plaintiff's theory of the case involves a top-down effort to replace older employees throughout the organization with younger replacements and when those replacements occurred within only months of the plaintiff's own firing, these distinctions are less relevant than the similarities alleged.

---

[15] Mr. Winston's employment with the Chiefs ended when Mr. Pioli decided not to renew his contract.

26

The trial court erred in excluding evidence from these witnesses as to their ages, the circumstances of their firing or resignations, and the ages of those who replaced them based on its incorrect belief that they had to be directly fired by the same person and that they had to be as sufficiently similar to Mr. Cox as was the "me too" witness in *Williams* or as would satisfy the admissibility standard in a disparate impact case. Moreover, as noted, many of these employees were in fact fired either directly by or at the direction of the same persons if Mr. Cox's evidence is believed.

This error requires reversal and remand of the case. The trial court applied the wrong test in determining the probative value of the evidence, and this led it to erroneously weigh the probative value of the evidence against its prejudicial effect. The trial court had determined that the evidence had little probative value because there was no pattern-or-practice claim and found the admission of the evidence of little logical relevance in light of this error. But the evidence is highly logically relevant because it makes the existence of a fact – the firing of Mr. Cox due to his age – much more probable than it would be without the evidence. Moreover, nothing about the nature of the evidence is likely to mislead or confuse the jury. The trial court's error in weighing the probative value led to its abuse of discretion in determining that the probative value was outweighed by the prejudicial effect of the evidence as to the offered witnesses.

As it cannot now be anticipated which witnesses will be offered at any new trial which may occur after remand or what specific or additional evidence may be offered as to them or others, there is no purpose to this Court directing the trial court as to the admissibility of the testimony of specific witnesses. On remand, the trial court should

consider the admissibility of the evidence of each witness who may be offered in light of this Court's opinion.

**B.  Exclusion of Herman Suhr's Testimony Regarding Age-Related Statements Made by Scott Pioli**

The trial court likewise erred in excluding the testimony of former Chiefs field security supervisor, Herman Suhr, that in August or September 2009 he overheard Scott Pioli say to an unknown person in a stadium hallway: "I need to make major changes in this organization as so many employees of CP [Carl Peterson] are over 40 years old." The trial court based its ruling on similar grounds as its ruling to exclude the age-related testimony of the employees discussed above, observing that Mr. Pioli was not directly involved in Mr. Cox's firing:

> [I]t's that Mr. Pioli was not a decisionmaker based upon all the evidence that I've heard in this case and the arguments and the pleadings that I've reviewed. Mr. Pioli was not a decisionmaker in the decision to terminate the plaintiff in this case and his responsibilities were apart and separate from the business side which the maintenance department fell under. Therefore, anything that he may have said, and particularly the remarks that were attributed to him by Mr. Suhr in his deposition, could only be couched to be as falling in the category of a stray remark and it would only serve to prejudice the defendant by somehow allowing, if the jury were to [sic] allowed to attribute those remarks to a decisionmaker in this case, and therefore the statement is not paramount under the impeachment line of cases that deal with proper impeachment because he was not a decisionmaker.

The trial court here was persuaded by the Chiefs' presentation of federal cases stating that "direct evidence" of discrimination excludes "stray remarks in the workplace," "statements by nondecisionmakers" and "statements by decisionmakers unrelated to the decisional process itself." *E.E.O.C. v. Liberal R-II Sch. Dist., 314 F.3d 920, 923 (8th*

*Cir. 2002) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011).* The distinction between direct and circumstantial evidence was significant in these cases because it controlled whether the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-01 (1973)*, for circumstantial evidence cases should apply.

But these cases do not say that "stray comments" or other comments by "nondecisionmakers" are wholly inadmissible; rather, the cases merely say that such comments do not constitute direct evidence. As noted, this Court and others have recognized that direct evidence is rare in the employment discrimination context, *see Daugherty, 231 S.W.3d at 818*, and so the mere fact that this evidence is circumstantial does not defeat its admission.

Similarly, the fact that a statement was made by a person other than the decisionmaker in Mr. Cox's case does not preclude its admission. To the contrary, this fact is supportive of Mr. Cox's theory of the case that his firing was part of a company-wide policy of age discrimination carried out by the highest level executives, including Mr. Pioli, who was Mr. Donovan's counterpart on the football side of the organization. The evidence that Mr. Pioli made this statement in close proximity to the time that Mr. Cox and others over 40 were fired and replaced with younger employees is, for the reasons already noted, relevant circumstantial evidence of what Mr. Cox alleges to be the motivation behind his firing.

The Chiefs' other objections to Mr. Suhr's testimony are equally unavailing. Mr. Cox sought to introduce the statement into evidence as an admission by a party opponent, and the Chiefs concede that under *Bynote v. National Super Markets, Inc., 891 S.W.2d 117, 124 (Mo. banc 1995),* "an admission of an agent or employee ... may be received in evidence against his principal, if relevant to the issues involved, where the agent, in making the admission, was acting within the scope of his authority." (Internal citation and quotation marks omitted). The Chiefs argue that because Mr. Pioli's authority extended only so far as the football operations side of the organization, this comment, if in fact it was made, fell outside the scope of his authority.

Once again, the fact that Mr. Pioli did not directly supervise Mr. Cox or order his firing does not mean that his comments are irrelevant when the theory of the case involves a company-wide policy. *See Griffin, 689 F.3d at 599* (recognizing that evidence could be related to a plaintiff's theory of the case where "various decisionmakers knew of the other decisions" made). Furthermore, *Bynote* also states that a company executive generally "has broad authority to bind the principal by his or her statements." *891 S.W.2d at 124.* [16]

The Chiefs further argue that it was within the trial court's discretion to exclude Mr. Suhr's testimony because it is "preposterous on its face" and unreliable because,

---

[16] The Chiefs do not make clear why the alleged statement would be outside of Mr. Pioli's authority. As the highest level executive in football operations, he certainly has hiring and firing authority. He himself testified that he made the decision to fire or to not renew the contract of potential witnesses in this case. As such, the Court will assume that the Chiefs are actually arguing that the comment is not relevant to the issues in this case.

among other things, he claims to have heard the statement from some distance and through a wall. But it is the responsibility of the jury, not the court, "to determine the credibility of witnesses, resolve conflicts in testimony, and weigh evidence." *State v. Letica, 356 S.W.3d 157, 167 (Mo. banc 2011).* The jurors are free to disbelieve a witness's testimony. *See State v. Jackson, 433 S.W.3d 390, 403 (Mo. banc 2014).*

### C. Exclusion of Any Testimony by Chiefs Chairman and CEO Clark Hunt

Mr. Cox sought to depose Chiefs Chairman and Chief Executive Officer Clark Hunt before trial and later sought to subpoena him to testify at trial. The trial court quashed both the deposition notice and the subpoena. The Chiefs argue that the trial court did not abuse its discretion in so doing because Mr. Cox failed to establish to what Mr. Hunt would have testified and how that testimony would have contributed to the case. This ignores the fact that a key part of Mr. Cox's theory of the case is that there was a company-wide discriminatory policy instituted by Mr. Hunt who "wanted to go in a more youthful direction." As such, Mr. Hunt's testimony is clearly relevant and discoverable. *See Rule 56.01(b)(1)* ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action …").

The Chiefs point to this Court's discussion in *State ex rel. Ford Motor Co. v. Messina, 71 S.W.3d 602 (Mo. banc 2002)*, of the need to protect top-level executives, such as Mr. Hunt, from unnecessary depositions. There the Court recognized:

> Even if the top-level employee has discoverable information, the organization or its top-level employee may seek a protective order. *Rule 56.01(c).* The party or person opposing discovery has the burden of showing "good cause" to limit discovery. *Id.*

31

> A protective order should issue if annoyance, oppression, and undue burden and expense outweigh the need for discovery. *Rule 56.01(c); Woytus,* 776 S.W.2d at 391; *Anheuser,* 692 S.W.2d at 328. For top-level employee depositions, the court should consider: whether other methods of discovery have been pursued; the proponent's need for discovery by top-level deposition; and the burden, expense, annoyance, and oppression to the organization and the proposed deponent. See *Anheuser,* 692 S.W.2d at 328.

*Id. at 607.* In *Messina*, a defective design case, the plaintiffs sought to first depose the CEO and other high-level executives. The Court held, based on the facts at issue in that case, that deposing the executives rather than the engineers Ford agreed to make available would have been unduly burdensome and that "plaintiffs should not begin a tangential inquiry by deposing Ford's top-level employees." *Id. at 608-09.*

Mr. Cox's claim is entirely different from that of the *Messina* plaintiffs. He contends that the discriminatory policy that contributed to his firing originated with Mr. Hunt himself. Certainly, the trial court did not abuse its considerable discretion in prohibiting Mr. Cox from going on a fishing expedition by deposing Mr. Hunt about topics that could be answered by lower level employees. But when the Chiefs deny that Mr. Hunt said he wanted to go in a more youthful direction and deny that there was any company-wide effort or direction to replace older workers with younger workers, there are specific questions that only Mr. Hunt can answer.

In those limited areas, the trial court abused its discretion in not permitting Mr. Hunt to be deposed. *Messina* specifically recognizes that "[o]pposing litigants may depose top-level executives who have discoverable information." *Id. at 606.* That Mr. Cox was precluded from doing so here materially affected his presentation of the merits

of his case.[17]

## IV. CONCLUSION

For the reasons stated above, the judgment is vacated and the case is remanded.[18]

_____
**LAURA DENVIR STITH, JUDGE**

Breckenridge, C.J., Draper, Teitelman and
Russell, JJ., concur; Fischer, J. dissents in
separate opinion filed; Wilson, J., concurs in
opinion of Fischer, J.

---

[17] Whether the trial court also should permit Mr. Hunt to be subpoenaed at trial is a separate issue that would depend on whether a sufficient reason was identified why his deposition testimony would not suffice and, therefore, is not further addressed here.

[18] Because the other errors alleged by Mr. Cox presumably will not be repeated on remand, they need not be addressed here.



# SUPREME COURT OF MISSOURI
## en banc

G. STEVEN COX, )
)
        Appellant, )
)
v. )    No. SC94462
)
KANSAS CITY CHIEFS FOOTBALL )
CLUB, INC., )
)
        Respondent. )

## DISSENTING OPINION

I respectfully dissent from the principal opinion's holding that the trial court abused its discretion in excluding the testimony of former Chiefs employees because the trial court's ruling was not against the logic of the circumstances then before it. In fact, its ruling that the probative value of the proposed testimony was outweighed by the potential prejudicial effect is consistent with its ruling not to allow the petition to be amended to add a claim alleging systematic discrimination.

"The general rule in Missouri is that evidence must be both logically and legally relevant in order to be admissible." *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). "Logically relevant evidence is admissible only if legally relevant." *Id.* "Legal relevance weighs the

probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* "Thus, logically relevant evidence is excluded if its costs outweigh its benefits." *Id.*

The principal opinion points out the trial court excluded the former employees' testimony based on Cox's failure to plead "pattern and practice" and Cox not being "similarly situated" to the other employees. The principal opinion goes on to explain why Cox should be deemed "similarly situated" for purposes of his claim of age discrimination under the relevant law. This analysis, however, only addresses logical relevance. That is, whether Cox is similarly situated to the other employees is relevant because it would tend to make the existence of a fact—that Cox was terminated because the Chiefs had a systematic plan to replace older workers—more probable. Whether Cox is similarly situated does not, however, touch upon legal relevance.

While the trial court may have suggested some of the excluded testimony was not logically relevant (e.g., by stating Cox was not similarly situated), more importantly, the trial court expressly ruled the former employees' testimony was not *legally* relevant: "**In my determination, any probative value of the testimony proposed by the plaintiff from these witnesses would be outweighed by the prejudicial effect it would have upon the jury. In addition, I believe the testimony of these other past employees would only serve to confuse and distract the jury.**" Tr. 2075:21–25 (emphasis added). The principal opinion does not persuasively address this independent basis of exclusion of the proposed testimony.

2

**The Trial Court's Ruling Was Not an Abuse of Discretion Because It Was Not Against the Logic of the Circumstances Then Before It**

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie*, 156 S.W.3d 351, 355 (Mo. banc 2005). Reversal is appropriate only when the trial court has clearly abused its discretion. *Id.* A trial court abuses its discretion when its "ruling is clearly against the logic of the *circumstances then before the court* and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *In re Care and Treatment of Donaldson*, 214 S.W.3d 331, 334 (Mo. banc 2007) (emphasis added).

The circumstances then before the trial court consisted of a petition with no claims based on a theory of systematic discrimination by the Chiefs, but only a claim based on a single act of discrimination directed at Cox individually—his own termination. Particularly significant to the procedural posture of this case is that, prior to the trial court excluding the former employees' testimony, Cox had attempted to amend his petition to include claims based on a theory of systematic discrimination by the Chiefs. The trial court had denied him leave to amend and that ruling is not challenged on appeal. The reason the trial court refused to allow Cox to amend his petition to add a "pattern or practice" claim was that Cox failed to present this claim to the Missouri Commission on Human Rights under § 213.075, RSMo 2000. Because Cox presented the Commission only with a claim based on a single act of discrimination, that is the only claim to which the Commission's 90-day letter applies, and Cox was not entitled to litigate any other claim. When the parties argued and the trial court denied Cox's motion to amend, all

understood the importance of the ruling, i.e., that it would severely restrict the breadth of "me too" evidence admissible at trial. Accordingly, when such evidence was offered, the trial court refused to admit it because doing so would, in effect, give Cox the benefit of presenting a claim that he was not legally permitted to plead. By itself, this was a sufficiently reasoned and rational basis for rejecting the proffered evidence to withstand scrutiny under the applicable—and lenient—abuse of discretion standard.

The principal opinion's willingness to second-guess the trial court's evidentiary decision risks serious harm to the process established in Chapter 213, RSMo. The requirement that an employee who has suffered workplace discrimination present his or her claim to the Commission is largely misunderstood and surely mis-served by the principal opinion. The Commission was not created merely to vindicate individual employee's rights. It has the power to order remedies that have this effect, but that it not its purpose. Instead, the Commission's purpose is to vindicate the public's interests in eradicating workplace discrimination. To enable the Commission to fulfill this broader public purpose, § 213.075 requires all those who have suffered such discrimination to present their claims to the Commission so that the Commission may determine which claims it will pursue in the public's interest and which the employees will be able to pursue on their own.

Many times, the Commission's "right of first refusal" under § 213.075 (*et seq.)* runs contrary to the preferences of employees (and their counsel), who would prefer to retain control over their claims. Allowing Cox the evidentiary benefit of a "pattern or practice" claim, even though he did not allow the Commission to decide whether it

4

wanted to pursue that claim on his behalf, suggests to future claimants they may do the same. Accordingly, even though the principal opinion is correct that "me too" evidence may be admitted as proof of a single-act claim (and that *the trial court* might properly have admitted some or all of the "me too" evidence proffered here), the decision by *this trial court* to exclude what amounted to days and days of such evidence because Cox failed to submit the "pattern and practice" claim to the Commission was not an abuse of discretion. This is particularly true because this trial court made an explicit finding that the breadth of the proffered evidence ran an unacceptable risk of confusing the jury regarding the specific act of discrimination for which the Chiefs were on trial.

Under these circumstances, it was not clearly against logic for the trial court to exclude evidence tending to show systematic discrimination because it was not legally relevant in this case that involved a single act of discrimination. That is, it was not unreasonable and arbitrary for the trial court to have determined the probative value of the former employees' testimony was outweighed by the prejudicial effect of confusing the issues (whether there was systematic discrimination versus whether Cox himself was discriminated against) and misleading the jury with which it could interpret as, essentially, propensity evidence.

## Conclusion

I agree the testimony excluded was logically relevant, as the principal opinion contends, but that is not dispositive. *See Howard v. City of Kansas City*, 332 S.W.3d 772, 786 (Mo. banc 2011) ("A court may exclude evidence that may have a prejudicial effect, even though the evidence is logically relevant, when the risk of unfair prejudice

5

outweighs the probative value."). Reasonable minds may differ, but my view after reviewing the record and applying the appropriate standard of review is that the trial court carefully considered its ruling and did not abuse its discretion when it determined that **"any probative value of the testimony proposed by the plaintiff from these witnesses would be outweighed by the prejudicial effect it would have upon the jury. In addition, I believe the testimony of these other past employees would only serve to confuse and distract the jury."** Tr. 2075:21–25 (emphasis added). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *In re Care and Treatment of Donaldson*, 214 S.W.3d at 334.[1]

_____
Zel M. Fischer, Judge

---

[1] The principle opinion repeatedly refers to the trial court's "error" in weighing the probative value of the excluded evidence against its prejudicial effect. Slip Op. at 17, 22, 27. However, it is undeniable that the admission of this category of evidence in response to an objection based on relevance was a "discretionary" ruling by the trial court and that this Court's standard of review of that discretionary ruling is for abuse of discretion, which is defined as "clearly against the logic of the circumstances . . . ." *In re Care and Treatment of Donaldson*, 214 S.W.3d at 334. If the majority has determined that the trial court's ruling was so wrong that it was firmly against logic—abuse of discretion would be the proper terminology.