

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| NORTHSTAR EDUCATION FINANCE, INC D/B/A TOTAL HIGHER EDUCATION (T.H.E.), | ) ) ) ) | WD81582 |
| | ) | OPINION FILED: |
| Respondent, | ) | |
| v. | ) ) | April 30, 2019 |
| SAMUEL L. SCROGGIE, | ) ) | |
| Appellant. | ) ) | |

**Appeal from the Circuit Court of Nodaway County, Missouri**
**Honorable Rebecca Spencer, Judge**

**Before Division Three: Thomas H. Newton, Presiding Judge,**
**Anthony Rex Gabbert, and Edward R. Ardini, Judges**

Mr. Samuel L. Scroggie appeals a Nodaway County Circuit Court judgment awarding damages to NorthStar Education Finance, Inc. (NEF) on its petition to recover the balance of defaulted 1998-2001 student loans. He challenges court rulings admitting certain evidence, NEF's standing to bring the petition, and the court's award of attorney fees to NEF. We affirm.[1]

---

[1] We have taken with the case NEF's motion for attorney fees incurred in connection with this appeal. Because we grant the motion, we also remand for the company to submit its final costs and fees to the circuit court.

Mr. Scroggie took out student loans under a "T.H.E. Loan Program" while attending Thomas M. Cooley Law School from 1998 through 2001.[2] The total amount he borrowed under this program was $20,800. He made payments on the promissory notes to NEF's loan servicer Great Lakes Educational Loan Servicing Corp. (Great Lakes) until 2014, at times under a hardship payment plan, and then defaulted. NEF d/b/a Total Higher Education (T.H.E.) Loan Program sought to collect the balance and ultimately filed a petition against Mr. Scroggie seeking $11,425.64, interest, and attorney fees. Mr. Scroggie filed a *pro se* answer, counter-petition, and affirmative defenses, including lack of standing, characterizing NEF as a debt collector and challenging the validity of the assignments among various entities for the rights to collect on the debt transferred. NEF filed a motion to dismiss the counter-claim, and the circuit court sustained the motion.

The case was tried in January 2018, and Mr. Scroggie made numerous objections on hearsay and foundation grounds to exhibits, challenged here, that established the debt, traced the history of the loan assignments, and accounted for his payments. The witness through whom NEF introduced the exhibits was its current CFO Mr. Charles Osborne, who was part of the T.H.E. Loan Program's creation and served on the board of directors of each of the NEF-related entities to which Mr. Scroggie's loans were

---

[2] Additional detail about the loan program and its relation to NEF appears in the legal analysis below. "We view the evidence and its reasonable inferences in the light most favorable to the trial court's judgment and we disregard contrary evidence and inferences." *Fed. Nat'l Mortg. Ass'n v. Bostwick*, 414 S.W.3d 521, 524 (Mo. App. W.D. 2013).

assigned.[3]  The court found Mr. "Osborne's testimony credible and competent to authenticate the exhibits as business records."  According to the court, NEF demonstrated its standing to bring the petition as each transfer was proved by clear and convincing evidence; it also found that Mr. Scroggie owed the balance of the loans, as well as interest and attorney fees.  It awarded NEF a total of $15,089.36.  Mr. Scroggie timely filed this appeal *pro se*.

## Legal Analysis

Four of the five points relied on challenge the trial court's evidentiary rulings. We review a trial court's decisions admitting or excluding evidence for an abuse of discretion.  *Fed. Nat'l Mortg. Ass'n v. Bostwick*, 414 S.W.3d 521, 524 (Mo. App. W.D. 2013).  "[A]bsent clear abuse of discretion, its action will not be grounds for reversal." *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015) (citation omitted).  "A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration."  *Id.* (citation omitted).  While one of the points challenges the trial court's ruling on NEF's standing, which should be addressed at the outset, we consider the first two points in order as predicates for establishing the admissibility of the documents that Mr. Scroggie contends in point three lacked the requisites to establish standing.

---

[3] Mr. Scroggie also objected to Mr. Charles Osborne testifying about the documents because his name had not been disclosed as a potential witness in discovery.  No depositions were taken before trial, so the court indicated that it would entertain a motion for continuance for Mr. Scroggie to depose Mr. Osborne.  Neither party sought a continuance as they were ready to proceed to trial, and Mr. Scroggie stated that he was asking instead that the witness not be allowed to testify.  The court overruled his objection to Mr. Osborne's testimony.  Although Mr. Scroggie mentions this objection in his brief, he does not base any of his points on this issue.

3

In the first point, Mr. Scroggie argues that the trial court erred in admitting his loan applications/promissory notes—Exhibits 1A, 2A, and 3A—into evidence because they were hearsay and inadmissible as business records in that Mr. Osborne was not competent to testify about documents prepared by other business entities. Relying primarily on *CACH, LLC v. Askew*, 358 S.W.3d 58 (Mo. banc 2012), Mr. Scroggie argues that NEF could not demonstrate evidence of the debt because the "lenders" on the loans were University National Bank or PNC Bank, and Mr. Osborne lacked competence to authenticate the documents because he had neither been an officer of these banks nor had he been employed by them.

*CACH* involved litigation instituted by a debt collector allegedly assigned an outstanding credit card debt owed by Mr. Jon Askew. *Id.* at 60. The company offered exhibits during trial purporting to be evidence of Mr. Askew's credit card account and sought to have them admitted as business records under section 490.680.[4] *Id.* Over objection, the court allowed a records custodian employed by CACH's owner to testify as to documents allegedly transferring or selling the accounts in a series of transactions leading to CACH through several unrelated entities. *Id.* at 60-61. Finding that CACH had purchased and been assigned all rights to collect Mr.

---

[4] Section 490.680, RSMo. (2016), addresses the competency of records as evidence, by stating the following:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

"Business records with adequate foundation are excepted from hearsay exclusion because we can presume the veracity of a business record when it is made in the regular course of business and contemporaneously to the event it records." *See Fed. Nat'l Mortg. Ass'n*, 414 S.W.3d at 528 (also noting that documents prepared for litigation are not business records).

Askew's debt, the trial court awarded CACH more than $6,000. *Id.* at 61. The Missouri Supreme Court reversed, concluding "that CACH failed to demonstrate that it had standing to pursue the collection of the money allegedly owed on [Mr.] Askew's credit card account." *Id.* at 65. The court made this determination by finding that CACH failed to produce any competent evidence of an assignment in the chain of title between two specific companies, neither of which employed the records custodian whose testimony was used to lay the foundation for admitting the documents making those assignments. *Id.* at 64. According to the court, section 490.680 requires that a records custodian or qualified witness lay the foundation for a business record. *Id.* That witness "must have sufficient knowledge of the business operation and methods of keeping records of the business to give the records probity." *Id.* (citation omitted). That knowledge is insufficient, according to our supreme court, where a records custodian of one business testifies that a document prepared by another business merely appears in the files of the business that did not create the record, or where the witness is familiar generally with how records are prepared in an industry. *Id.* at 63-64. This case is distinguishable given Mr. Osborne's particularized and exhaustive knowledge about the process involved in making and documenting student loans under the T.H.E. Loan Program, which made the loans extended to Mr. Scroggie.

Mr. Osborne testified that he was on the board of directors of an NEF predecessor when it created the T.H.E. Loan Program in coordination with educational leaders in Minnesota who had been asked by the U.S. Department of Education to start a new loan-guarantee corporation following the Higher Education Assistance Foundation's bankruptcy. The company, then known as NorthStar Guarantee, was "in

5

the business of accepting documents from various schools and – and processing them for the federally[ ]guaranteed portion of student loans." The company "would provide both documentation and . . . would be reviewing documentation that was to substantiate the federally[ ]guaranteed loans and actually processing that guarantee." According to Mr. Osborne, NorthStar Guarantee then began in 1997 to go into the business of originating loans, both federally guaranteed and private, and securitizing them by issuing bonds to fund the loans. NorthStar Guarantee divided into a Division A and a Division B, which was an independent entity that NEF succeeded in 2001. Mr. Osborne was a director of Division B and of NEF, a nonprofit organization. He testified that, after a student would apply for a loan on a form with the designation "T.H.E. Loan Program" at the top, the loan would be processed by NEF's predecessor or NEF which would direct the funding bank—University National Bank, PNC, or First Union National Bank—to release the funds that NEF's predecessor or NEF would immediately reimburse. This process was used so loans could be made by federally chartered banks across state lines. While documents in the chain of title among NEF entities included a bill of sale from the funding bank, the bill of sale was a document that NEF's predecessors had created, according to Mr. Osborne. At no time did the original loan application/promissory note leave the possession of NEF entities or NEF.

As to Exhibits 1A, 2A, and 3A, Mr. Osborne testified that he was familiar with the documents and how they were maintained in the ordinary course of business for nonlitigation purposes. He explained how a student would obtain the application form in a student loan aid office, complete it, and give it to a school official who would certify attendance and the amount of tuition. The form would be mailed to the Post

6

Office box designated at the top of the form for the T.H.E. Loan Program, the address in Minnesota for NEF, and then NEF's predecessor or NEF would approve disbursement of the loan request or would underwrite the loan. Mr. Osborne testified that NEF was not in the business of purchasing defaulted loans to collect on them. Mr. Osborne was qualified to lay a foundation for Exhibits 1A, 2A, and 3A. The evidence clearly showed that NEF or its predecessor created the loan program and the loan applications/promissory notes, processed the loans, and maintained possession of the notes when Mr. Osborne served as a director of NEF's predecessor or NEF and Mr. Scroggie applied for his loans. He had sufficient knowledge of the business operation and methods of keeping records of the business to authenticate the documents. The trial court did not abuse its discretion in admitting the promissory notes. This point is denied.

In the second point, Mr. Scroggie claims that the trial court erred in admitting Exhibits 1B, 2B, and 3B into evidence because they were hearsay and inadmissible as business records in that Mr. Osborne was not competent to testify about documents prepared by other business entities. The B series of documents included the wire reports documenting the amounts disbursed to Mr. Scroggie, bills of sale and blanket endorsements, and other transfers and assignments between NEF financing entities through 2003, which Mr. Osborne testified were business records created and maintained in the ordinary course of NEF's business organization. On cross-examination, he testified that these records are maintained in an NEF storeroom.

7

Starting with Exhibit 1B, which related to the loan for which Mr. Scroggie applied in 1999, Mr. Osborne testified about the process by which the documents were created as follows:

This is the – After the disbursing of the – The process that occurred using this exhibit is that the underwriting would be completed by NorthStar, NorthStar would authorize the disbursement. Typically schools would receive tuition at two different dates, so although the plaintiff or the individual would apply for one loan, there would be two different disbursements under the loan. The instructions for that disbursement would go from NorthStar to, in this case, University National Bank, and University National Bank would send the money to the school. Then on that very same day, the – NorthStar, through its own financing, would effectively reimburse University National Bank the monies for that loan.

And you're going to go through the – the following pages, which have the actual disbursement instructions, in this case, to the detailed activity report for 12/30 – well, this is – the 12/30/1999 for $3,000. You can see Mr. Scroggie's name there on the activity report. This is one of the disbursements made under this original promissory note.

Q. And going – turning to the fourth page, which is a transfer agreement, purports to be a transfer agreement between NorthStar THE Funding, LLC and NorthStar THE Funding II, LLC, is that correct?

A. Correct. Two of our subsidiaries using the financing of these loans. In 2001, these were used as collateral in a financing, and they had to be transferred through these organizations effectively to ensure the trustees that there were no other prior claims or liens on the loans. And you can see that's signed by Mr. Thornton, who is an officer of THE Funding, LLC and of both organizations, both I and II.

Behind that is an actual – Mr. Scroggie's loan is identified specifically with a token number, and we – with a redacted page, we have provided the identification – specific identification of this loan within the group of loans that were transferred for collateral.

Q. What was the rest of the chain of assignment, as it's been termed?

A. This was a – The bill of –

* * *

8

Q. All right, Mr. Osborne, turning further, you see a bill of sale, assignment and assumption of liabilities. It is a – purports to be between NorthStar Guarantee, Division B, and [NEF], which is the entity which you are the CFO for, correct?

A. And all of these other entities too.

Q. Yes. So can you walk us through this transfer as well?

A. Yes. This is the final transfer. Division B, which was the origination branch of the – of NorthStar Guarantee, upon [NEF] receiving its tax-exampt status, all the assets. All the liabilities of NorthStar Guarantee were transferred into [NEF], and that's – this is the document that does that.

But I want – If I may, I need to correct one thing I just said, because I pointed to this pile. I am not an officer of PNC, First Union National Bank, or University National Bank.

Q. But you were an officer of the entity with which – from which those loans were transferred?

A. Correct.

As to Exhibit 2B, which related to the loan for which Mr. Scroggie applied in 2000, Mr. Osborne testified about the process by which the documents were created as follows:

This is the disbursement record for the first part of the loan. It was an $8,000 loan. The first half was $4,000 and the $160 was the origination fee that was reimbursed at that time as well, and that 160 is retained, and the net amount to the school is 4,000. Did you – Just the first page, or the remaining pages as well?

Q. Just the first page.

A. Okay.

Q. Are you familiar with the process by which this record is created?

A. I am.

Q. Are you familiar with the process by which this record is kept and maintained?

9

A. I am.

Q. Is it the business practice of NorthStar to create and make use of business records for nonlitigation purposes?

A. Yes.

   \* \* \*

Q. Mr. Osborne, can you walk us through this as well?

A. Similarly, this loan took a very similar path. There is a bill of sale from University National Bank to THE Funding, LLC. There is another wire report for the second installment of this loan you'll see down – go down to the middle of the page, Samuel Scroggie, and a bill of sale for that disbursement. And – And the transfer agreement from LLC to Funding II as part of a bond issue that was made in '01. And the token – redacted page, again this is a loan with a token last three digits -905.

  These pages are redacted because the practice of the servicer is to use the social secuity number followed by three digits – portions of the social security number. So this page was at one point filled with a host of other loans that were with it, and we redacted that out.

  Bill of sale from – then from Division B and blanket endorsement and assumption of liabilities to transfer this to [NEF].

Q. And just for the record, were you an officer of the first entity to which the loan was transferred?

A. Yes.

As to Exhibit 3B, which related to the loan for which Mr. Scroggie applied in

1998, Mr. Osborne testified about the process by which the documents were created as

follows:

This is, again, a disbursement report for the amount of – the first half of the 6,800, you'll see at the bottom the $3,400 disbursed on November 6, 1998, and on the next page, the disbursement on 12/22/1998, for the next $3,400 second half of the loan.

Q. And what – Are you familiar with how these records are created?

A. Yes.

10

Q. Are they created at or near the time of the events in question?

A. Yes.

Q. By a person with knowledge of the facts?

A. Yes.

Q. Are they created for – pursuant to policies for nonlitigation purposes?

A. Yes.

Q. Are you familiar with how they are kept and maintained?

A. Yes.

　　 * * *

Q.  All right.  Mr. Osborne, this loan is different than the other two loans in its chain of title.  Can you walk us through that?

A. Yes.  This loan was – The disbursing bank was PNC Bank, and PNC Bank was actually providing a credit line to – what we call the Warehouse Credit Line to – to the loan program.  They also had, just for capacity reasons, asked First Union National Bank to participate with them – with them in this warehouse line, hence you see a transfer – a bill of sale from PNC Bank to First Union Bank as the next bill of sale and blanket endorsement with the form of bill of sale and the blanket endorsement, and then ultimately over to THE Funding, LLC, and then from Funding, LLC to Funding II, and it took the same path as the other loans to that case in a blanket endorsement, the redacted token page, and finally Division B transfers to NEF.
  In the course of – this was – note was dated in 1998, and the initial arrangement we had for funding loans by NorthStar was using PNC and First Union.  We move – then went – The other two loans you have, we were using University National Bank later on.

Mr. Osborne was not affiliated with the banks represented in these sale, transfer, and assignment chains, but he testified that NorthStar had created the documents that the banks used and maintained them in the regular course of business for non-litigation purposes.  He was affiliated, either as a director or CFO, with every other entity in the chain of title which, as noted above, transferred loans made under a program that NEF's

11

predecessor created.[5]  He explained the business operation for which these documents were created and testified that he was familiar with how they were kept and maintained. The *CACH* requirement that the qualified witness laying a foundation for business records under section 490.680 "must have sufficient knowledge of the business operation and methods of keeping records of the business to give the records probity" is met here.  The trial court did not abuse its discretion in admitting these exhibits. This point is denied.

In the third point, Mr. Scroggie argues that the trial court erred in finding that NEF had standing based on Exhibits 1B, 2B, and 3B because the assignments lacked the required information to prove a valid assignment as to each predecessor in that they contain blanket endorsements and assignments that did not identify the underlying loans or Mr. Scroggie.  Standing presents a question of law, so we review the issue on appeal *de novo*.  *CACH*, 358 S.W.3d at 61.

> A party has standing to sue when it has "a justiciable interest in the subject matter of the action." *Garrison v. Schmicke*, 354 Mo. 1185, 193 S.W.2d 614, 615 (1946); *see also Midwestern Health Mgmt., Inc. v. Walker*, 208 S.W.3d 295, 298 (Mo. App. [W.D.] 2006) (stating that standing to sue "exists when a party has an interest in the subject matter of the suit that gives it a right to recovery, if validated.").

---

[5] Mr. Scroggie contends that NEF's evidence on the relationship between NEF and the NEF entities in the chain of title was contradictory and inconsistent, pointing to the company's sworn response to an interrogatory indicating that NEF is not the parent company of any other companies and Mr. Osborne's testimony that the NEF entities in the chain of title were subsidiaries.  He cites case law indicating that, where "the testimony of *a witness* contains antagonistic and irreconcilable statements of fact in which one class tends to sustain the allegations of the petition and the other to disprove them," the case is not "for the determination of a jury." *Mo. Interstate Paper Co. v. Gresham*, 116 S.W.2d 228, 230 (Mo. App. 1938) (emphasis added) ("Until a witness can determine for himself what he saw or did not see, a jury is not warranted in making the determination for him.").  Here, NEF's witness did not make antagonistic and irreconcilable statements of fact.  Nor do we find the testimony and interrogatory response inconsistent.  The interrogatory queried whether NEF *is* the parent company of any other company, to which NEF responded "No."  Mr. Osborne testified that he was a director of NEF's predecessor, NEF, and all the subsidiaries in the chain of title, which were "financing subsidiaries." Because Mr. Osborne also testified that NEF ceased originating loans in 2008, it is unclear whether the entities in the chain of title, which the evidence showed had by then transferred their assets to NEF, are currently in operation.

*Id.*

First, we do not believe that the trial court based its conclusion about standing solely on the B series of exhibits. As to the assignment of the notes, reflected in Exhibits 1B, 2B, and 3B, the trial court distinguished them from the assignments in *CACH* by observing that they "were effectuated as [NEF's] business structure changed from originating student loans to administering them, and that the assignments were to new entities in [NEF's] business activity." According to the court, this case "does not 'involve a party attempting to recover on an account owed to some other party.'" The court further concluded that NEF had an interest in the subject matter of the action by addressing other evidence relating to Mr. Scroggie's interactions with NEF's servicer and agent, Great Lakes. Mr. Scroggie sought forbearance and hardship payment plans from Great Lakes, which, in the trial court's view, amounted to an admission that he owed the debt, and NEF gave Great Lakes the authority to enter into such payment plans. "The hardship payment plans were both requested after the 2003 transfer of the notes from Northstar Guarantee, Inc. to [NEF] so both requests and all subsequent payments went to [NEF]. Under well-established principles of agency law, payment to an agent is the same as payment to the principal." The court also concluded that NEF proved chain of title under *CACH* by addressing Mr. Osborne's competence to testify about the business practices and authenticity of the business records of each transferring entity. The final evidentiary matters the court relied on to conclude that NEF had standing involved Mr. Scroggie's admission through his questioning of Mr. Osborne and his own testimony that "he had requested the loans, signed the promissory notes, and used the proceeds to fund his legal education." Mr. Scroggie did not show

13

in any way that the loans had been paid in full, and he testified that he had made payments to NEF's servicer Great Lakes. As discussed in more detail below regarding evidence of Mr. Scroggie's payments, we have no reason to disagree with the trial court's findings and conclusions as to NEF's standing.

Second, we do not believe that the cases on which Mr. Scroggie relies support his argument that the blanket endorsements failed to identify the underlying loans or Mr. Scroggie thus implicating NEF's standing to sue. In *Student Loan Marketing Association v. Holloway*, 25 S.W.3d 699 (Mo. App. W.D. 2000), this Court did not rule that the plaintiff lacked standing to collect a student-loan debt for alleged deficiencies in the chain of title; rather, we stated that, without documents connecting the blanket endorsements to the promissory notes, the plaintiff failed to lay an adequate foundation showing the assignments of the notes to the plaintiff. *Id*. at 704. We remanded for the plaintiff to do so. *Id.* Here, by contrast, Mr. Osborne clearly linked the promissory notes to the bills of sale with blanket endorsements and the other documents that identified Mr. Scroggie's loans as among those transferred. As indicated above, the documents in the chain of title were also attached to the promissory notes and submitted as exhibits. In *Holloway*, a number of the supporting documents apparently could not be found and had not been submitted during trial. *Id.* at 703-04.

*C & W Asset Acquisition, LLC v. Somogyi*, 136 S.W.3d 134 (Mo. App. S.D. 2004), is similarly unhelpful to Mr. Scroggie. There, the exhibit consisting of the documents purporting to show the chain of title contained an affidavit by the plaintiff loan-company servicer's employee. *Id.* at 136 n.2. The trial court refused to admit the exhibit, finding that it lacked the basic elements for the admission of a business record

14

under section 490.680, and dismissed the case for insufficient evidence. *Id.* at 137. While the appeals court determined that the affidavit substantially complied with section 490.692, it found that the trial court did not abuse its discretion in excluding the evidence because, lacking a live witness to testify as to where the records came from or who authored them, the plaintiff could not prove the mode of their preparation. *Id*. at 139-40. In dicta, the court also indicated that the documents on their face failed to establish "the credit agreement, default and balance due as argued by [the plaintiff]." *Id*. at 140. Some of the shortcomings the court mentioned may be applicable to the documents submitted here, but given Mr. Osborne's testimony explaining how the records were created and related to each other, *Somogyi* is distinguishable.

Based on all the evidence introduced at trial, we conclude that NEF had standing to bring this action. Its predecessor created the loan program through which Mr. Scroggie obtained some of the student loans he used for law school, and its predecessor supplied the funding for those loans. The payments that he made were made to NEF's loan servicer which sent the payments to NEF. Mr. Scroggie defaulted on the loans and owes NEF the balance. This point is denied.

In the fourth point, Mr. Scroggie challenges the trial court's admission into evidence of Exhibits 4, 5, and 6 because they were hearsay and inadmissible business records in that Mr. Osborne was not competent to testify about documents prepared by other business entities. He contends that the documents were generated by Great Lakes or maintained on its computer system. Because Mr. Osborne did not work for Great Lakes, Mr. Scroggie aruges that he was not competent to testify as to its business records.

15

During trial, Mr. Osborne discussed the relationship between Great Lakes and NEF, testifying that Great Lakes "was under contract to NorthStar, they did not take ownership of the loans; they simply provided custodial and records keeping services on our behalf at our – on our audit." He also testified that Great Lakes "would – And we would retrieve documents as we need – as necessary, when needed for – for debtors or actions such as this." According to Mr. Osborne, "The recordkeeping by Great Lakes was essentially receiving cash payments from debtors, applying them to the loans, and providing various accounting reports and records, reporting to credit bureaus, the IRS, and the like." Exhibit 4 consisted of "various documents used for the request for hardship." Mr. Osborne testified that "NorthStar, through Great Lakes, would allow the loan to be placed in either suspension, forbearance, or the payment to be revised to reflect the capacity and the ability of the individual to make the loan payment." While he acknowledged that Great Lakes created the documents, Mr. Osborne testified that Great Lakes did so at NEF's direction, and that he was familiar with how they were kept and maintained and that they were created for nonlitigation purposes in the regular course of business. Mr. Osborne then discussed the separate parts of the exhibit, testifying that they involved Mr. Scroggie's 2002 request for a forbearance and his 2004 and 2005 requests for a hardship payment plan.

Exhibit 5 consisted, according to Mr. Osborne, of "photocopies, screenshots essentially, from the accounting system of Great Lakes Loan Servicer maintained for NorthStar's loans. We actually have online access to this system in our offices in Eagen." He further testified, "This is a printout of the loan activity on the combined balances for Mr. Scroggie's indebtedness to the loan program." Mr. Osborne testified

16

that he was familiar with how the records were created and maintained and that they were created for nonlitigation purposes in the ordinary course of business. In response to Mr. Scroggie's questions on voir dire, Mr. Osborne testified that "[NEF] keeps all of these records under contract using a contract provider of – of custodial lockbox services, which is the service that Great Lakes provides to all of the loan companies that they serve as the servicer for." He further testified, "In some cases, particularly in the context of these records are maintained directly by NorthStar in its offices in Eagen." The first page showed Mr. Scroggie's three loans. The second page, which Mr. Osborne characterized as a ledger, showed the payments disbursed to Mr. Scroggie and then reduced by reimbursements from the school for loan amounts not needed. Mr. Osborne explained the codes used for the "payment type" column in the sixteen pages following the first page of Exhibit 5, observing that some of the payments were actually T.H.E. rebates of interest to the debtor. According to Mr. Osborne, "As a business, NorthStar – 90 percent of our excess of revenue or expenses is rebated to the student borrowers in the form of a rebate of interest. We do it every month. Ten percent of it is reserved by NorthStar and is used to make grants to institutions of higher education for scholarships." He further explained that each of the pages showed the progression of all payments on Mr. Scroggie's loans over the years to the date of default, "which was May 29, 2014." He had no concerns over the accuracy of the records, testifying that Great Lakes and NEF are audited by the same company, and indicated that the documents are used "for monthly reporting purposes to the three credit bureaus for purposes of credit rating and then annually for purposes of creating 1099s for interest

17

payments made by debtors reporting that to the IRS." Mr. Osborne reported the principal and interest due on the default date, as reflected in Exhibit 5.

Exhibit 6 was described by Mr. Osborne as follows:

> This is a computer maintained on – A computer system-maintained record of every interaction of the staff of Great Lakes and NorthStar with the borrower with notations to the file as to date and time and – and the action taken, very shorthand. This is the – When – When either NorthStar, typically it's our default diversion group, or staff for Great Lakes has a [sic] interaction with the borrower, they're required to document their conversations for use in later conversations.
>
> Q. So this is a printout of information that is on your system?
>
> A. Correct.
>
> Q. Are you familiar with how this data is kept and retrieved?
>
> A. Yes.
>
> Q. With how it's reported?
>
> A. Yes.
>
> Q. Is it the business practice of [NEF] to create and maintain such records for nonlitigation purposes?
>
> A. Yes.

Mr. Osborne testified in more detail about the exhibit, noting that it showed emails, phone calls, and letters sent to Mr. Scroggie about his loans. When asked how a particular entry would get into the file, Mr. Osborne testified as follows:

> That is actually someone contacted, reached out, and talked to the borrower. They used an auto-dialer to do that. As you can imagine, the way this works is there's actually preloaded phone numbers of debtors to call, and when they finally hit – an auto-dialer hits and someone picks up, you'll actually get it coming up on the screen of the – of the NorthStar – in this case, Great Lakes person – let's see the date – yes, Great Lakes person, and then you'll see a notation as to what happened.

18

So for instance, dialer called, borrower no answer. Letter sent. The one that you're contacting, talked to borrower, will make payment next week.

Q. So is it correct to say that once – when there's an interaction with the servicer, that's reported and reported to you, and that is maintained on your database?

A. We have actually –

Q. Yeah. Access.

A. – access to this through our own – we are – we are in the Great Lake – We can go into the Great Lakes system.

Q. Perfect. Do you have any reason to doubt the accuracy of this?

A. No.

Under *CACH*, a witness who cannot testify about the identity or mode of preparation of a business record or about how that record has been kept and maintained is not competent to authenticate it. Great Lakes was the servicer of NEF's loans and thus its agent; Mr. Osborne established his familiarity with the records' creation, preparation, use, and maintenance.[6] The trial court did not clearly abuse its discretion in admitting Exhibits 4, 5, and 6. This point is denied.

In the fifth and final point, Mr. Scroggie challenges the trial court's award of attorney fees to NEF, claiming that the court had no competent evidence on which to base that award. The promissory notes, Exhibits 1A, 2A, and 3A, each contain a provision under which the borrower agrees to pay the costs of suit, the costs of collection, and "if permitted by law, reasonable attorneys' fees." Reiterating his argument that the trial court erred in admitting these exhibits, Mr. Scroggie contends

---

[6] Even if the Court were to decide that Mr. Osborne was not competent to testify about Great Lakes' documents, these documents are, according to NEF, not dispositive of the court's judgment. They essentially establish what Mr. Scroggie owes on the defaulted student loans, and he did not dispute that amount. He has disputed to whom he owes the balance only.

that NEF had no contracts on which to base its claim for attorney fees. Because we have already determined that the trial court did not abuse its discretion in admitting the exhibits and because attorney fees may be recovered under a contractual provision, we deny this point.

## Conclusion

Finding that NEF had standing to recover the balance of the student-loan debt Mr. Scroggie incurred under the T.H.E. Loan Program and that the trial court did not abuse its discretion in admitting exhibits establishing his liability for the debt and allowing NEF to recover attorney fees, we affirm. We grant NEF's motion for attorney fees and remand to the circuit court for a determination of the amount of attorney fees and costs to be awarded.

/s/ *Thomas H. Newton*

Thomas H. Newton, Presiding Judge

Gabbert, and Ardini, Judges concur.

20