

# In the Missouri Court of Appeals
## Western District

RICHARD DIXSON, )
                Respondent, )
v. )       **WD81804**
                )
MISSOURI DEPARTMENT OF )
CORRECTIONS, )      **FILED: July 23, 2019**
              Appellant. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE JUSTINE E. DEL MURO, JUDGE

### BEFORE DIVISION ONE: VICTOR C. HOWARD, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND GARY D. WITT, JUDGES

The Missouri Department of Corrections ("DOC") appeals the judgment following a jury verdict against it and in favor of Richard Dixson on his retaliation claim under the Missouri Human Rights Act ("MHRA"). The jury awarded Dixson $280,000 in actual damages and $1.2 million in punitive damages. On appeal, the DOC contends the circuit court erred in failing to reduce the punitive damages award by applying a credit for punitive damages awarded in a prior case and a statutory cap on damages. The DOC further argues that the court erred in denying its motion for a new trial due to a biased juror; allowing portions of an inadmissible

investigative report to be read into evidence; and in allowing four "me too" witnesses to testify.  For reasons explained herein, we find no error and affirm.

**FACTUAL AND PROCEDURAL HISTORY**

Richard Dixson has been employed by the DOC since 1995 and has worked at its Kansas City Reentry Center ("KCRC") since 1998.  Lilly Angelo was the warden at the KCRC from 2013 through 2017.

When Dixson first started working for the DOC, he was a Corrections Officer 1, or prison guard.  He was promoted to Corrections Classifications Assistant, a position that helped offenders find jobs, complete job applications, and operate in the community.  Eventually, his position was reclassified to Reentry Activity Coordinator, for which he continued to work closely with offenders to help them successfully reintegrate into society.

For several years prior to 2014, Dixson served as a union steward.  As a union steward, he "represented other employees and stuck up for them and went to bat for their rights."  Through this position, he became very familiar with DOC policies and procedures.

In June 2014, Dixson filed a hostile work environment complaint alleging that Angelo was nitpicking and harassing him regarding how he was carrying his pepper spray and his two-way radio.  According to Dixson, Angelo told him it was mandatory that he carry his pepper spray and radio on his belt, but Dixson knew the policy did not require that, and he believed that it would be easier for him to

2

access his pepper spray and radio if they were not attached to his belt. Dixson's complaint was returned for "supervisory action," but he did not believe that he would get a fair investigation. He filed a grievance and was eventually able to get Angelo's directive regarding how employees were to carry their pepper spray and radios overturned. Dixson reasonably and in good faith believed that Angelo's nitpicking and harassing him was based on his race. Dixson is Caucasian, and Angelo is African-American.

Six months after Dixson filed the grievance, Angelo began retaliating against him. She took away IT duties that Dixson had been performing for KCRC since the early 2000s, when the warden of KCRC at that time asked Dixson to be KCRC's contact person for IT duties. Dixson's IT duties included connecting and maintaining programmable phones, computers, printers, monitors, and copy machines. He "took pride" in his IT duties. Dixson was not told why Angelo took away his duties. Later, Bryant Holmes, one of the deputy wardens at KCRC, told Dixson that Angelo took away his IT duties because she "couldn't stand [him] and that she would do anything to [him] to make [his] job hell." Additionally, Dixson later heard that Angelo told several people in management that she took away his IT duties because she had a "reasonable suspicion" that he had deleted video footage off of the DVR system. Dixson denied deleting any video footage. Dixson believed his reputation in the DOC suffered as a result of what Angelo falsely said about him.

Angelo also sabotaged Dixson's opportunity to reclassify his position to one at a higher pay level. Because he believed that he was performing the duties of a higher position, Dixson completed a form requesting to be paid at the higher level. Dixson's immediate supervisor signed off on the form, agreeing that his position should be reclassified. Instead of sending that form to the Office of Administration, however, Angelo, without telling Dixson, sent a different form that did not show that his immediate supervisor agreed with his reclassification request. Dixson did not get the reclassification.

Dixson's complaints of retaliation also included Angelo's denying him flex time. After he suffered an injury, he asked for flex time to go to doctor's appointments. Angelo denied his request several times. Dixson filed a grievance, and his request for flex time was eventually granted by Dave Dormire, the Director of Adult Institutions. Dixson also asked for flex time to take his son to baseball practice. Angelo denied his request, even though at least five or six other employees were on a flex time schedule at the time. Dixson filed a grievance and was granted 45 days of flex time.

According to Dixson, the treatment he received at work "severely" affected him and made him feel belittled, angry, agitated, and bad. He could not sleep well at night, had blood clots, and was scared to go to work.

In August 2016, Dixson filed a petition for damages in which he alleged that the DOC violated the MHRA. In his petition, Dixson asserted claims of race discrimination, hostile work environment, and retaliation. A jury trial was held in

4

December 2017.  Several of Dixson's co-workers offered testimony corroborating Dixson's account of his experiences at KCRC.  The jury returned a verdict in favor of Dixson on his retaliation claim and in favor of the DOC on his race discrimination and hostile work environment claims.[1]  The jury awarded Dixson $280,000 in actual damages and $1.2 million in punitive damages.  The DOC appeals.[2] Additional facts will be discussed where relevant to the DOC's points on appeal.

## ANALYSIS

In Point I, the DOC contends the circuit court erred in failing to reduce the punitive damages award by applying a credit pursuant to Section 510.263.4[3] for punitive damages awarded in a prior case, *Hesse v. Missouri Department of Corrections*, Jackson County Circuit Court Case No. 1416-CV07836.

The determination of whether the DOC is entitled to a credit under Section 510.263.4 presents a mixed question of fact and law, as the circuit court was required to assess the facts to determine whether the statutory credit applied. When reviewing mixed questions of fact and law, we defer to the circuit court in its assessment of the facts and then apply *de novo* review in determining how the law applies to those facts.  *Rhea v. Sapp*, 463 S.W.3d 370, 375 (Mo. App. 2015).

---

[1] Because the jury found in favor of the DOC on Dixson's race discrimination and hostile work environment claims, we have not included the facts supporting those claims in this opinion.

[2] While this case was pending, Dixson filed a motion to strike portions of the DOC's appendix and Points I, III, and IV of the DOC's brief.  We deny this motion.

[3] All statutory references to Section 510.263.4 are to the Revised Statutes of Missouri 2016.

5

Section 510.263.4 allows a defendant to request a credit against a punitive damages award for amounts previously paid for punitive damages arising out of the same conduct. The statute states, in pertinent part:

> Within the time for filing a motion for new trial, a defendant may file a post-trial motion requesting the amount awarded by the jury as punitive damages be credited by the court with amounts previously paid by the defendant for punitive damages arising out of the same conduct on which the imposition of punitive damages is based. At any hearing, the burden on all issues relating to such a credit shall be on the defendant and either party may introduce relevant evidence on such motion. Such a motion shall be determined by the trial court within the time and according to procedures applicable to motions for new trial. If the trial court sustains such a motion the trial court shall credit the jury award of punitive damages by the amount found by the trial court to have been previously paid by the defendant arising out of the same conduct and enter judgment accordingly. If the defendant fails to establish entitlement to a credit under the provisions of this section, or the trial court finds from the evidence that the defendant's conduct out of which the prior punitive damages award arose was not the same conduct on which the imposition of punitive damages is based in the pending action, or the trial court finds the defendant unreasonably continued the conduct after acquiring actual knowledge of the dangerous nature of such conduct, the trial court shall disallow such credit[.]

§ 510.263.4. After the defendant files a motion requesting credit, the court may, but is not required to, hold a hearing. *Id*. The defendant has the burden to establish that it is entitled to a credit. *Id*.

In its post-trial motion, the DOC requested that the court credit the $1.2 million punitive damages award in this case with $1 million in punitive damages that were awarded in January 2016 to Debra Hesse on her sexual harassment and

6

retaliation claims against the DOC.  The DOC argued that Dixson "relied heavily" on the similarities between the *Hesse* verdict and this case to support his claims and that Hesse's claims "arose out of the same course of conduct" as the conduct alleged in this case.  The circuit court denied the DOC's motion without granting a hearing.

On appeal, the DOC asserts that it is entitled to a credit under Section 510.263.4 because the punitive damages award in *Hesse* involved the same course of conduct, the same facility, and the same count of retaliation as in this case.  The DOC argues that, throughout the trial in this case, Dixson was allowed to present evidence concerning the *Hesse* verdict and its aftermath; therefore, the punitive damages award in this case must have been based upon the same conduct upon which the punitive damages award in the *Hesse* case was based.  We disagree.

While the imposition of punitive damages in this case appears to have been based, in part, upon the same *type* of conduct committed at the same DOC facility as in the *Hesse* case, the punitive damages award in this case was not based on the same *conduct* on which the imposition of punitive damages was based in the *Hesse* case.[4]  The punitive damages award in this case was not based upon the sexual harassment and retaliatory conduct directed at Debra Hesse; instead, it was

---

[4] *See, e.g., Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 667-68 (Mo. App. 1997), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013) (discussing the application of Section 510.263.4 where plaintiffs in multiple lawsuits were awarded punitive damages against a helicopter manufacturer for a single helicopter crash).

7

based upon different conduct – the retaliatory conduct directed at Dixson.  While the court did allow testimony concerning the *Hesse* verdict and its aftermath, the court limited such testimony to that which showed what remedial changes, if any, the DOC made in the way that it handled complaints after the *Hesse* verdict.  The DOC's knowledge of the *Hesse* verdict and the DOC's handling of complaints after that verdict was relevant to the determination of whether the DOC acted with reckless indifference in the way it treated Dixson.  *See Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 88-89 (Mo. App. 2015) (finding that an employer's knowledge of abusive conduct and repeated failure to take effective action to stop the conduct evidenced reckless indifference).  Hence, the punitive damages award in this case did not punish the DOC a second time for its misconduct toward Hesse but, rather, punished the DOC for its misconduct toward Dixson, which the jury could have reasonably found to be recklessly indifferent in light of the *Hesse* verdict.  Because the punitive damages award in this case was not based upon the same conduct for which the punitive damages award was imposed in the *Hesse* case, the circuit court did not err in denying the DOC's motion for a credit.  Point I is denied.

In Point II, the DOC contends the circuit court erred in failing to cap the punitive damages award.  The DOC argues that, prior to the entry of judgment, the Missouri legislature amended the MHRA to cap the total actual and punitive damages allowable in MHRA actions.  The DOC asserts that the damages cap is a procedural change and, therefore, is retroactively applicable to cap the total damages award in this case at $500,000.

8

Dixson filed his petition for damages in August 2016, asserting claims based upon conduct that he alleged occurred prior to that time. In 2017, while his petition was pending, the legislature passed Senate Bill 43 ("SB 43"), which amended the MHRA. Among other things, the amendments changed the standard to be used in assessing claims of discrimination under the MHRA[5] and set a cap on the total amount of actual and punitive damages to be awarded. SB 43's damages cap is codified in Section 213.111.4,[6] which provides:

> 4. The sum of the amount of actual damages, including damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages awarded under this section shall not exceed for each complaining party:
>
> (1) Actual back pay and interest on back pay; and
>
> (2)(a) In the case of a respondent who has more than five and fewer than one hundred one employees in each of twenty or more calendar weeks in the current or preceding calendar year, fifty thousand dollars;
>
> (b) In the case of a respondent who has more than one hundred and fewer than two hundred one employees in each of twenty or more calendar weeks in the current or preceding calendar year, one hundred thousand dollars;
>
> (c) In the case of a respondent who has more than two hundred and fewer than five hundred one employees in each of twenty or more

---

[5] The amendments changed the standard for determining whether a practice is unlawful from whether the protected classification is a contributing factor in the decision to discriminate to whether the protected classification is the motivating factor. *See Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 794-95 (Mo. App. 2018) (citing § 213.010(2), RSMo Supp. 2017).

[6] All references to Section 213.111 are to the Revised Statutes of Missouri 2016, as updated by the 2017 Supplement.

calendar weeks in the current or preceding calendar year, two hundred thousand dollars; or

(d) In the case of a respondent who has more than five hundred employees in each of twenty or more calendar weeks in the current or preceding calendar year, five hundred thousand dollars.

The amendments to the MHRA, including Section 213.111.4's new statutory cap on damages, went into effect on August 28, 2017.

Prior to the December 2017 trial on Dixson's petition, the DOC filed a motion *in limine* requesting that the court apply all of the new statutory amendments to this case. The court made a preliminary ruling that, while the changes to the standard used to assess discrimination claims were substantive and could not be retroactively applied,[7] the new damages cap was procedural and, therefore, could be retroactively applied to Dixson's case. In its motion for new trial, the DOC renewed its request that Section 213.111.4's damages cap be applied to cap Dixson's total actual and punitive damages. The court denied the DOC's request.

Statutory amendments are presumed to operate prospectively. *Bram*, 564 S.W.3d at 795. There are two exceptions to this presumption: "(1) if the legislature clearly expresses an intent that the amendment be given retroactive application, either in the express language of the act or by necessary implication; or (2) the statute is merely procedural or remedial, rather than substantive." *Id*. Here, the legislature did not clearly express an intent to give SB 43's amendments to the

---

[7] Since that time, we ruled in *Bram*, 564 S.W.3d at 795, that SB 43's amendments to the standard applied in assessing MHRA claims were substantive and, consequently, applied only prospectively.

MHRA retroactive application either in the express language of the act or by necessary implication. The DOC and Laclede Gas Company, as amicus curiae, argue that exception (2) applies because the cap on damages is merely procedural or remedial.

To support this argument, the DOC and its amicus rely on *Vaughan v. Taft Broadcasting Co.*, 708 S.W.2d 656 (Mo. banc 1986). In *Vaughan*, the Supreme Court ruled that "punitive damages are remedial and that a plaintiff has no vested right to such damages prior to the entry of judgment." 708 S.W.2d at 660. The Court explained that punitive damages are not a matter of right, and "their award lies wholly within the discretion of the trier of fact." *Id*. Applying this rule, the Court held that an amended statute *eliminating* the plaintiff's right to punitive damages, which became effective after the plaintiff's cause of action accrued but before the entry of judgment, could be applied to eliminate the plaintiff's punitive damages award. *Id*. Thus, based on *Vaughan*, a cap on punitive damages is remedial and can be retroactively applied to actions that accrued before its effective date.

As Dixson notes, however, SB 43 does not simply cap punitive damages. It caps the total amount of punitive and *actual* damages. § 213.111.4. The Supreme Court addressed the retroactivity of caps on actual damages in *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752 (Mo. banc 2010). In *Klotz*, the Court ruled that "the legislature cannot change the substantive law for a category of damages after a cause of action has accrued." 311 S.W.3d at 760. Applying

11

this rule, the Court held that an amended statute that placed a cap on non-economic damages in a medical malpractice case could not be retroactively applied to a cause of action that accrued prior to the amended statute's effective date because the amended statute would be unconstitutional as applied. *Id*. Thus, under *Klotz*, a cap on actual damages is substantive and cannot be retroactively applied to actions that accrued before its effective date. Because the damages cap in Section 213.111.4 has the effect of limiting the total damages that a plaintiff may recover, including compensatory damages, under *Klotz*, the cap on the total amount of actual and punitive damages must be interpreted to apply only prospectively to actions that accrued on or after its effective date of August 28, 2017.

The DOC's new-trial motion in the circuit court asked the court to apply the damages cap in Section 213.111.4 to reduce the total amount of actual and punitive damages Dixson was awarded. On appeal, the DOC takes a different tack and argues that the damages cap should be applied retroactively solely to the jury's award of punitive damages. This is not the argument the DOC made in the circuit court, however, and "[w]e will not 'convict a trial court of error on an issue that was not put before the trial court to decide.'" *Loutzenhiser v. Best*, 565 S.W.3d 723, 730 (Mo. App. 2018) (quoting *Barner v. Mo. Gaming Comm'n*, 48 S.W.3d 46, 50 (Mo. App. 2001)). In any event, the DOC's argument on appeal asks this court to effectively rewrite Section 213.111.4, to create a separate cap on punitive damages, where none was enacted by the legislature. The DOC's argument is akin

12

to an argument that we should sever a portion of Section 213.111.4 that cannot constitutionally be applied retroactively (the cap on compensatory damages), from the limitation on punitive damages. The legislature did not enact separate caps on actual and punitive damages, however – it enacted a single, aggregate cap on the total damages a plaintiff could recover. "Severance does not authorize – and cannot justify – an intrusion by this Court into the legislative prerogative" by rewriting a statute to do something different than what the legislature enacted. *State v. Hart*, 404 S.W.3d 232, 245 (Mo. banc 2013).

Our interpretation is supported by the Supreme Court's adoption of new Missouri Approved Jury Instructions for MHRA claims pursuant to SB 43's amendments. In May 2018, the Supreme Court adopted new MAIs that concerned both the new standard to be applied in assessing MHRA claims and the new damages cap. *See Bram*, 564 S.W.3d at 795; *Gilberg v. Assoc. Wholesale Grocers, Inc.*, No. 6:15-CV-03365-MDH, 2018 WL 3614982, at *9 (W.D. Mo. July 27, 2018). Specifically, the Court approved instructions regarding the standard to be applied "for actions accruing before August 28, 2017," and the standard to be applied "for actions accruing on or after August 28, 2017." With regard to damages, the Court approved MAI 38.09, which states:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any actual damages including back pay, other past [and future] economic losses, and any past [and future] emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-economic losses as a direct result of the occurrence mentioned in the evidence.

13

Additionally, the Court approved a new verdict form, MAI 38.10, which requires the jury to separately list the dollar amount of damages it awards for each category of actual damages, including back pay, past economic losses not including back pay, future economic losses, and non-economic losses. Both MAI 38.09 and MAI 38.10 are necessary to apply the damages cap set forth in Section 213.111.4, as the statute requires the court to determine the sum of the amount of all of the separate categories of actual damages plus punitive damages, and adjust that amount to ensure that it does not exceed actual back pay and interest on that back pay plus an additional amount of damages dependent upon the size of the company. The Court specifically stated that these new instructions apply to "actions accruing on or after August 28, 2017." MAI 38.09; MAI 38.10. Moreover, the Committee Comments and Notes on Use to MAI 38.09 and MAI 38.10 direct practitioners to older damages and verdict forms to use "[f]or MHRA actions accruing before August 28, 2017." MAI 38.09, Committee Comment G; MAI 38.10, Notes on Use 6.

Retroactively applying Section 213.111.4's cap on the total amount of actual and punitive damages to Dixson's action, which accrued several years before Section 213.111.4's August 28, 2017 effective date, would be unconstitutional. This interpretation is supported by the Supreme Court's enactment of new MAI instructions on damages and a verdict form that the Court specifically stated are for "actions accruing on or after August 28, 2017."

14

Therefore, the circuit court did not err in denying the DOC's request to apply Section 213.111.4's damages cap to this case. Point II is denied.

In Point III, the DOC contends the circuit court erred in denying its motion for new trial because it was prejudiced by a biased juror who was a teacher at Dixson's son's school. Specifically, the DOC asserts that the juror indicated a reluctance to serve as foreperson in case the verdict was not reached in favor of Dixson, which the DOC argues showed that she was reluctant to find against Dixson.

After trial, the DOC filed a pleading titled, "Motion to Address Juror Bias." In this motion, the DOC alleged that, following the verdict, its counsel spoke to the jury foreperson, A.F. A.F. told the DOC's counsel that one of the other jurors, K.K., who taught in the school district where Dixson lived, had said that she did not want to be foreperson because she did not want to suffer repercussions from Dixson if the verdict were unfavorable to him. The court held an evidentiary hearing on the motion, during which both A.F. and K.K. testified. Following the hearing, the court denied the DOC's request for a new trial.

Generally, "a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 87 (Mo. banc 2010). There are two narrow exceptions to this rule. *Id*. at 88. First, the court may consider juror testimony about juror misconduct that occurred outside of the jury room, such as the gathering of extrinsic evidence. *Id*. Second, the court may consider juror

15

testimony when "a juror makes statements evincing ethnic or religious bias or prejudice during deliberations." *Id*. at 89.

Neither exception applies in this case. Thus, even though the court held an evidentiary hearing on the DOC's motion, it did not need to do so. K.K.'s alleged statements, which she denied making, did not constitute statements evincing ethnic or religious bias or prejudice during deliberations; consequently, those statements could not be used to impeach the jury's verdict. The circuit court did not err in denying the DOC's motion for new trial on the basis of juror bias. Point III is denied.[8]

In Point IV, the DOC contends the circuit court erred in allowing significant portions of an investigative report to be read into evidence. The DOC argues that the report was inadmissible because the portions read consisted of hearsay and conclusions.

We review the circuit court's ruling on the admission of evidence for an abuse of discretion. *Curl v. BNSF Ry. Co.*, 526 S.W.3d 215, 225 (Mo. App. 2017). Prior to trial, the DOC filed a motion *in limine* in which it argued that the court should exclude any testimony regarding "allegedly discriminatory statements, actions, or conduct by past or present employees or supervisors at MDOC who had no working relationship with Richard Dixson and/or no participation in the

---

[8] Both parties analyzed Point III as an issue of juror nondisclosure, with the DOC arguing that K.K. intentionally failed to disclose that she was a teacher at Dixson's son's school. There was no nondisclosure, however, as no question was asked during voir dire that triggered K.K.'s duty to provide such information. *See Johnson v. McCullough*, 306 S.W.3d 551, 555 (Mo. banc 2010).

16

employment actions at issue." The DOC also sought to exclude "testimony regarding other litigation, claims, or allegations or unrelated discrimination or bad acts against MDOC or its employees."

During a hearing on the DOC's motion *in limine*, the DOC argued that it was specifically seeking to exclude evidence of the Malloy report because it contained evidence of other claims of discrimination by parties not involved in the case. The Malloy report was written by Ann Malloy, who was in independent investigator hired by the DOC after the *Hesse* verdict in January 2016. Malloy was tasked with investigating the "working conditions and discriminatory conditions of . . . several of the women" at KCRC. Dixson's counsel argued the Malloy report was relevant because it showed the hostile working environment and retaliatory conduct of the DOC. He asserted that several of the DOC employee witnesses who were going to testify in Dixson's case saw the report and "took some actions to try and address some of the issues that [it] found." He informed the court that he planned to offer the report through one of those witnesses as an admission of a party opponent because it was "a report of working conditions that their own investigator found."

The court found that, because none of the witnesses was the author of the report but had merely received the report, there was not a sufficient foundation upon which to admit it. The court further found that "reports like that don't come into evidence because they're hearsay." The court informed the parties that the report could be used to refresh a witness's recollection that an investigation

17

occurred and to talk about whether the witness was put on notice that there were issues of retaliation, but the report could not be admitted into evidence.

On appeal, the DOC argues that, despite the circuit court's ruling on the motion *in limine*, the court allowed Dixson to read "significant portions" of the Malloy report into evidence during the testimony of Matt Briesacher, who was the Director of the Office of Professional Standards for the DOC and was in charge of investigations into discrimination. Before addressing the merits of the DOC's argument, we note that the DOC cites several questions to Briesacher about the report that it claims were objectionable, but it either did not object to those questions or did not object on the same basis that it now asserts on appeal, which is that the report contained hearsay and conclusions. "[F]ailing to object to improper questions also fails to preserve anything for appeal." *St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 125 n.6 (Mo. banc 2013). The DOC does not ask us for plain error review of those questions. "Plain error review is rarely granted in civil cases." *Id*. We find no circumstance warranting plain error review in this case. *See id*. Therefore, we will review only the question cited in the DOC's brief to which an objection on the basis of hearsay was made.

The one question to Briesacher about the Malloy report to which the DOC objected on the basis of hearsay occurred when Dixson was asking him about a section in the Malloy report regarding "the atmosphere of retaliation" surrounding three individuals who were accused of misconduct at KCRC. When Dixson asked

18

Briesacher if those three individuals were unhappy about being moved to a different shift, Briesacher said he never talked to the three individuals. Dixson then asked Briesacher, "Do you remember from the report that that's what Miss Malloy found, that the three individuals got moved to a different shift and they were mad about it, and they were looking to retaliate?" Briesacher said he did not remember. Dixson asked, "You don't remember?" Briesacher replied, "I don't remember that part." When Dixson attempted to use the report to refresh Briesacher's memory, the DOC objected on the basis that questions about Malloy's findings were improper hearsay. In response, Dixson argued that he was attempting to "show the things that [Briesacher] was put on notice about, and what did he do to respond." He further argued that "the evidence is coming in as notice and reaction to it, or response to the safety of the employees. I don't think that's improper at all." The court overruled the DOC's objection, stating, "I think especially when a person in the position such as his has access to a report and we have allegations of a hostile work environment that it's appropriate for him to go through it . . . [a]nd address whether or not he acted on any of the conclusions or claims."

Evidence that, because of the Malloy report, Briesacher was aware of retaliatory conduct by KCRC employees following complaints of discrimination was relevant to establishing the DOC's notice of such conduct. The DOC recognized this during a bench conference earlier in the trial when it informed the court that, with regard to the admissibility of the Malloy report, "to the extent that there's alleged acts of discrimination that they were on notice for, I don't have an

19

objection to that. But the actual details on the sexual harassment and . . . the details of what the allegations were is improper." The question to which the DOC objected did not get into the actual details about sexual harassment discussed in the report. Therefore, the circuit court did not abuse its discretion in allowing the question. Point IV is denied.

In Point V, the DOC contends the circuit court erred in allowing four "me too" witnesses to testify. The DOC argues that their testimonies were irrelevant and more prejudicial than probative because Dixson failed to show that he had experienced treatment similar to the treatment they had experienced.

We review the admission of this evidence for an abuse of discretion. *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015). "As with other forms of evidence, circumstantial evidence of employment discrimination must be both logically and legally relevant to be admissible." *Id*. at 116. "Evidence is logically relevant if it tends to make the existence of any consequential fact more or less probable, 'or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case.'" *Hesse v. Mo. Dep't of Corr.*, 530 S.W.3d 1, 5 (Mo. App. 2017) (quoting *Cox*, 473 S.W.3d at 116). Evidence is legally relevant where its probative value outweighs its prejudicial effect. *Id*.

Prior to trial, the DOC filed a motion *in limine* to exclude "me too" testimony from Beatrice Young, Gena Ross, Jennifer LaFleur, and Leesa Wiseman on the basis that it would be irrelevant and prejudicial because the witnesses and Dixson were

20

not similarly situated.  During a hearing on the DOC's motion, Dixson's counsel went through each of the four witnesses and discussed the aspects of similarity between their situations and Dixson's.  The court found that each of the four witnesses were employed at KCRC during the same time as Dixson, under the same management, and, like Dixson, faced retaliation after filing discrimination claims.  The court concluded that such evidence was "very compelling" and "very similar to [Dixson's] circumstances and his theory of the case."  While the court acknowledged their testimonies would be prejudicial to the DOC, "those are the circumstances."  Therefore, the court denied the DOC's motion *in limine* to exclude the four witnesses' testimonies.  During the trial, the court overruled the DOC's objections to these witnesses' "me too" testimonies.

In determining the admissibility of "me too" evidence, "[t]here is no one set of agreed-upon factors, and no one factor is dispositive."  *Cox*, 473 S.W.3d at 122.  Instead, "'courts look to and weigh *aspects* of similarity [between party and non-party employees] given the facts, context, and theory of the specific case at issue."  *Hesse*, 530 S.W.3d at 5 (quoting *Cox*, 473 S.W.3d at 123).

In this case, Dixson and the four "me too" witnesses worked for KCRC at the same time, and they all shared the same or a very similar chain of command.  Dixson alleged that the DOC engaged in race discrimination, created a hostile work environment, and retaliated against him for filing complaints.  All four of the "me too" witnesses testified that they filed complaints of discrimination and that, after doing so, they, too, suffered retaliation.  Dixson further alleged that the DOC knew

21

about the discrimination and harassment but failed to remedy it and maintained inadequate and ineffective written and unwritten policies, procedures, or guidelines with respect to discrimination and retaliation. Like Dixson, Young, Ross, and LaFleur testified that, after they complained about discrimination, harassment, or a hostile work environment, the DOC did nothing in response to their complaints.

While the DOC argues that the testimonies of the four "me too" witnesses should have been excluded because the "me too" witnesses were female, some were African-American, and the ways in which they were discriminated and retaliated against were different in some respects from Dixson's experiences, we find "those differences were less relevant than their commonalities." *Hesse*, 530 S.W.3d at 5. Although "not similarly situated in all respects," their "shared characteristics made their 'me too' evidence relevant and admissible." *Id*. Moreover, the DOC has not established that the prejudicial effect of the "me too" evidence outweighed its probative value. The circuit court did not abuse its discretion in admitting the testimonies of the four "me too" witnesses. Point V is denied.

Dixson filed a motion for costs and attorneys' fees on appeal pursuant to Section 213.111.2. Section 213.111.2 authorizes a court to award "court costs and reasonable attorney fees to the prevailing party."

> A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit. Where a plaintiff has prevailed in an action under the MHRA, the court should award attorneys' fees unless special

22

circumstances would render such an award unjust. This includes fees incurred on appeal from the trial court's judgment.

*Mignone v. Mo. Dep't of Corr.*, 546 S.W.3d 23, 45 (Mo. App. 2018) (citation omitted).

Because we are affirming the judgment in Dixson's favor, Dixson is the prevailing party and "is entitled to an award of [his] attorney's fee on appeal" and costs. *Id*. While we "'have authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested.'" *Id*. at 45-46 (citation omitted). Therefore, we remand the case to the circuit court for the purpose of conducting a hearing to determine the reasonableness of the costs and attorneys' fees requested and to enter an appropriate award.

## CONCLUSION

The judgment is affirmed. The case is remanded to the circuit court to determine and award Dixson his costs and reasonable attorneys' fees incurred in this appeal. Dixson's motion to strike portions of the DOC's appendix and Points I, III, and IV of the DOC's brief is denied.

_____
**LISA WHITE HARDWICK, JUDGE**

ALL CONCUR.

23